# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

GARY M. RITTEN, M.D.,

      Plaintiff,                          Case No. 07-10265

v.                                      Hon. Gerald E. Rosen

LAPEER REGIONAL MEDICAL CENTER,
McLAREN HEALTH CARE CORPORATION,
BARTON P. BUXTON, DARLENE F. DALY, D.O.,
LISA M. ALLEN, D.O., JAN GROMADA, D.O.,
and SCOTT MANGO, R.N.,

      Defendants.

_____/

## OPINION AND ORDER REGARDING
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    March 11, 2009

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I. <u>INTRODUCTION</u>

Plaintiff Gary M. Ritten, M.D. commenced this case in this Court on January 17, 2007, asserting a claim of retaliation under the federal Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, against Defendant Lapeer Regional Medical Center ("LRMC") and its parent company, Defendant McLaren Health Care Corporation, and also asserting state-law claims of tortious interference, defamation, and

breach of contract against Defendant LRMC and subsets of the individual Defendants —

a group that includes Barton P. Buxton, the president and chief executive officer of

LRMC; Scott Mango, R.N., the chief nursing officer for LRMC; and Darlene F. Daly,

D.O., Lisa M. Allen, D.O., and Jan Gromada, D.O., three obstetricians who hold clinical

privileges at LRMC.[1]  Each of Plaintiff's various claims arises from the suspension of his

clinical privileges to treat patients at LRMC, a decision that was initially made by

Defendant Buxton in September of 2005, and that was upheld by LRMC's Board of

Trustees in September of 2006 following a lengthy hearing process.  This Court's subject

matter jurisdiction rests upon Plaintiff's assertion of a claim arising under federal law.

*See* 28 U.S.C. §§ 1331, 1367(a).

Through a motion filed on February 27, 2008, Defendants now seek an award of

summary judgment in their favor on all of Plaintiff's federal and state-law claims.  First

and foremost, Defendants contend that damages may not be awarded to Plaintiff under

any of his several theories of liability, in light of the immunity conferred under the federal

Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq.,* for

decisions reached in a hospital's professional review process.  In addition, Defendants

argue that certain of Plaintiff's claims are legally deficient, and that Plaintiff has failed as

a matter of law to provide sufficient evidentiary support for one or more required

---

[1]Plaintiff also asserted antitrust claims against the Defendant obstetricians under the
federal Sherman Act, but these claims were dismissed through a stipulated order entered on
September 6, 2007.

elements of each of his claims.

Defendants' motion has now been fully briefed by the parties,[2] and the Court heard oral argument on this motion on December 5, 2008. Having thoroughly reviewed the parties' briefs, the accompanying exhibits, and the record as a whole, and having considered the arguments of counsel at the December 5 hearing, the Court now is prepared to rule on Defendants' motion. This Opinion and Order sets forth the Court's rulings on this motion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Parties

Plaintiff Gary M. Ritten, M.D. is a board certified obstetrician/gynecologist (Ob/Gyn) who has been licensed to practice medicine in Michigan since 1988. He initially was granted medical staff privileges at the Defendant Lapeer Regional Medical Center ("LRMC") in 1999, and was reappointed to the medical staff in September of

---

[2]This briefing includes a surreply filed by Plaintiff in further opposition to Defendants' motion. Although Defendants evidently did not concur in Plaintiff's request to file this surreply and two accompanying exhibits, they have not responded to Plaintiff's May 13, 2008 motion requesting leave to file this additional brief. In light of the extensive latitude granted to the parties in their briefing in support of and opposition to Defendants' motion, and in light of the modest length and scope of Plaintiff's surreply, the Court elects to accept Plaintiff's additional submission, and has reviewed and considered this surreply in deciding Defendants' motion.

The Court reaches a different conclusion, however, as to the supplemental brief that Defendants have sought to file after the December 5 hearing. Having reviewed this proposed submission, the Court finds that it does not raise any issues that could not have been addressed in Defendants' pre-hearing submissions or at oral argument, and that, in any event, the arguments advanced in this supplemental brief are not particularly helpful to the Court's disposition of Defendants' motion. Accordingly, the Court denies Defendants' request for leave to file this supplemental brief.

2001 and again in September of 2003. This lawsuit arises from the summary suspension

of Plaintiff's staff privileges in September of 2005, followed by a permanent suspension

of these privileges in September of 2006.

Defendant LRMC is an acute care hospital located in the city of Lapeer, Michigan,

and is a wholly owned subsidiary of Defendant McLaren Health Care Corporation.

Defendant Barton P. Buxton has been the president and chief executive officer of LRMC

since December of 2003. At all relevant times, the chief nursing officer at LRMC was

Defendant Scott Mango, R.N. The remaining Defendants — Darlene F. Daly, D.O., Lisa

M. Allen, D.O., and Jan Gromada, D.O. — are Ob/Gyns who, like Plaintiff, held staff

privileges to treat patients at LRMC, and who allegedly took actions that contributed to

the loss of Plaintiff's staff privileges.

**B.    The Events Leading up to the Suspension of Plaintiff's Staff Privileges**

Clinical staff privileges are granted at LRMC for two-year periods, and are

renewed through a process known as "reappointment" or "recredentialing." This process

begins with a review by the Medical Staff Credentials Committee of various materials,

including information provided by the Quality Department. The Credentials Committee

forwards its recommendation to the Medical Executive Committee, which in turn makes

its recommendation to the Board of Trustees, the final authority on the matter.

As noted, Plaintiff's staff privileges had been renewed in September of 2001 and

September of 2003, so he was due to go through the reappointment process in September

of 2005. This process had been revised in the summer of 2005 with the arrival of a new

4

Director of Quality, Jo Weth.  Among other changes instituted by Weth and other administrative officials, including Defendant Buxton, it was determined that the Credentials Committee should be given additional historical data for each physician being considered for recredentialing.  This additional data consisted of a "grid" that summarized all of the "occurrence" and "incident" reports that had been made about a given physician over the past five years.

Upon preparing these grids for Plaintiff and the other physicians (approximately 25 in number) who were scheduled for recredentialing in September of 2005, Weth discovered that Plaintiff was the subject of three times as many reports as any other physician under review.[3]  Weth further determined that the 88 reports about Plaintiff comprised 21.6 percent of the reports about all LRMC physicians (numbering approximately 200) over the past five years.  In addition, Weth prepared a chart of "patient safety indicators" for each physician who was scheduled for recredentialing, and this chart revealed a trauma rate of 47.46 percent for Plaintiff when he delivered babies using a vacuum extractor, versus a national trauma rate of 21.9 percent and a trauma rate for other LRMC Ob/Gyns of 22.9 percent.

Approximately two weeks before these materials were to be presented to the Credentials Committee at its scheduled September 2, 2005 meeting, Weth, Buxton, and

---

[3]Specifically, the grid for Plaintiff disclosed 88 reports over the preceding five-year period, while the grid for the physician with the next-highest number of reports disclosed only 27 reports over the same time period.

two other individuals — Judy Trotter, the manager of the Medical Staff Office, and Dr.

Charles Franckowiak, the Chair of the Credentials Committee — met to ensure that all of

the necessary information was ready for presentation at the forthcoming committee

meeting.  Upon seeing the reports for Plaintiff, Dr. Franckowiak expressed a desire to

discuss these reports with Dr. Olan Dombroske, the Chair of the Quality Committee, and

a meeting was convened among Dr. Franckowiak, Dr. Dombroske, Buxton, and Weth.

Following this meeting, it was determined that an outside obstetrician should review the

materials concerning Plaintiff.  The physician Buxton chose for this task was Thomas

Petroff, D.O., who worked at another hospital affiliated with Defendant McLaren, and

who had served along with Buxton on a committee that addressed issues common to all

McLaren affiliates.

Upon receiving the reports for Plaintiff, Dr. Petroff asked to review the medical

records for roughly 90 of Plaintiff's patients.  Dr. Petroff explained at his deposition that

his review focused principally upon patients who had undergone vaginal deliveries of

babies with instruments, including a vacuum extractor and forceps.  Through this review,

Dr. Petroff concluded that the trauma rate shown on the "patient safety indicators" report

for Plaintiff was too high, and reflected errors in coding the procedures used on Plaintiff's

patients.[4]  Nonetheless, Dr. Petroff's review disclosed a different concern — namely, that

_____

[4]With regard to the 88 incident and occurrence reports about Plaintiff, Dr. Petroff
testified that his selection of patient records for review was not meant to address these reports,
and he made no effort to assess the validity of the concerns expressed in these reports.

6

Plaintiff's rate of vacuum delivery appeared to be high, and that the medical records provided to Dr. Petroff failed to disclose Plaintiff's justification for this technique, which tended to pose more risk to the mother and baby.  Thus, Dr. Petroff reported back to Buxton his concern that it was difficult to determine whether Plaintiff was adhering to a proper standard of care, in light of the lack of justification in the records Dr. Petroff had reviewed for Plaintiff's seemingly high use of vacuum deliveries.  (*See* Defendants' Motion, Ex. 8, Petroff Dep. at 140.)[5]

On Friday, September 2, 2005, Buxton summarily suspended Plaintiff's privileges at LRMC.  In a letter sent to Plaintiff that day, Buxton stated:

> It has come to our attention that your obstetrical practice at Lapeer Regional Medical Center poses a substantial likelihood of immediate injury to the health of patients.  Preliminary review of a large number of your cases demonstrated frequent deviation from patient safety indicators in your treatment of obstetrical patients and in your delivery of babies.  In particular and without limitation, these deviations included numerous, unnecessary instrument-assisted deliveries.

(Plaintiff's Response, Ex. D-13, 9/2/2005 Letter.)  Buxton testified that he spoke to Dr. Petroff before making this decision, and that he also had heard Dr. Petroff's concerns in a telephone conference call with Dr. Petroff and Dr. Franckowiak.  (*See* Defendants'

---

[5]As Plaintiff points out, Dr. Petroff conceded at his deposition that he was not provided the complete patient charts prior to reaching this initial conclusion.  In particular, he was not given the fetal heart monitoring strips that might have disclosed fetal distress, and which in turn could have provided the justification for a vacuum delivery.  (*See* Petroff Dep. at 82-84, 152-53.) Dr. Petroff explained that there was not sufficient time to obtain and examine these additional materials within the few days in which he was asked to conduct his initial review.

Motion, Ex. 4, Buxton Dep. at 231.)[6]  Yet, while Dr. Petroff confirmed at his deposition

that he was in contact with Buxton in the days leading up to September 2 and had

expressed a general concern about what he had learned to that point, he further testified

that his review of patient records extended through the Labor Day weekend of September

3 through September 5, 2005, and had not yet concluded as of September 2.  (*See* Petroff

Dep. at 110-16.)

Pursuant to the LRMC's Medical Staff Bylaws, a meeting of the Medical

Executive Committee ("MEC") was convened on Tuesday, September 6, 2005 to address

the suspension of Plaintiff's privileges.  After hearing from Plaintiff, Buxton, and Dr.

Petroff, the MEC voted to rescind the summary suspension of Plaintiff's privileges, but

further determined (i) that a preceptor should be appointed to supervise all of Plaintiff's

operative deliveries, and (ii) that Plaintiff's past "cases of concern" should be reviewed

by a consultant recommended by the American College of Obstetricians and

Gynecologists.  (*See* Defendants' Motion, Ex. 9.)  As a result of the MEC's

recommendations, Plaintiff's privileges were reinstated on the morning of Wednesday,

September 7, 2005.

Following this action by the MEC, Buxton brought this matter to the attention of

the LRMC's Board of Trustees at a special meeting called on September 9, 2005.  At this

_____

[6]For his part, Dr. Franckowiak could not recall whether this conference call occurred
before or after the initial suspension of Plaintiff's privileges on September 2, 2005.  (*See*
Defendants' Motion, Ex. 2, Franckowiak Dep. at 69.)

meeting, the Board heard from Dr. Gunda Reddy, the Vice-Chief of the Medical Staff, who explained the reasons for the MEC's decision.  The Board also heard from Weth, who noted the large number of incident reports regarding Plaintiff, and from Dr. Petroff, who outlined his concerns about Plaintiff's practices and opined that Plaintiff "should have been proctored 4 years ago."  (Defendants' Motion, Ex. 10, 9/9/2005 Board Meeting Minutes at 3.)[7]  In addition, Dr. Daly — the Chief of the Medical Staff at the time, and Plaintiff's colleague on the Ob/Gyn staff — recounted her experiences with Plaintiff, both as a peer and as a proctor to Plaintiff when he first arrived at LRMC,[8] and Chief Nursing Officer Mango summarized a number of past incidents that had caused him concern about Plaintiff's patient care practices.  Plaintiff was not invited to attend this meeting.

At the conclusion of this special meeting, the Board went into executive session and voted to reinstate the summary suspension of Plaintiff's privileges as initially imposed by Buxton.  Buxton informed Plaintiff of this decision in a letter dated

---

[7]According to Weth, Dr. Petroff presented literature at the Board meeting suggesting a greater incidence of learning disabilities among babies delivered through vacuum extraction.  (*See* Plaintiffs' Response, Ex. I, Weth Dep. at 171-72.)  Weth further testified that Dr. Petroff cautioned the Board that the LRMC should be prepared to set aside a lot of money for the lawsuits that would be filed by the parents of babies delivered by vacuum extraction.  (*Id.* at 173.)  Several Board members recalled Dr. Petroff's expression of strong concern at this meeting about Plaintiff's use of vacuum extraction, and acknowledged that this played a significant role in their decision to reinstate the suspension of Plaintiff's privileges.  (*See* Defendants' Motion, Ex. 31, Mersino Aff. at ¶¶ 7-9, 12; Ex. 31, Champion Aff. at ¶¶ 4-6, 8; Ex. 12, Incarnati Dep. at 63, 135; Ex. 13, Lawter Dep. at 89-90.)

[8]According to Weth, Dr. Daly told the Board that she was "concerned with [Plaintiff's] quality [of patient care] from the beginning," that she made it clear that Plaintiff should not have staff privileges, and that, more generally, she had nothing positive to say about Plaintiff in her remarks at the Board meeting.  (Weth Dep. at 166-71.)

September 9, 2005, and advised him of his right under the Medical Staff Bylaws to request a hearing within 30 days. (*See* Defendants' Motion, Ex. 15, 9/9/2005 Letter.) Buxton further informed Plaintiff, however, that his privileges would remain suspended throughout the hearing process.

## C.     The Incident Regarding Patient "L"

During the same period in the late summer of 2005 that Plaintiff was going through the recredentialing process, an incident arose concerning the care of a patient identified by the parties as Patient "L." This patient arrived at LRMC's emergency room at around 11:00 p.m. on August 8, 2005, and was promptly sent to the hospital's labor and delivery unit in light of her 20-week pregnancy and her complaints of vaginal bleeding and light to moderate cramping. There, she was evaluated by Nurse Barbara Wager, who then paged Plaintiff at 11:48 p.m. and described to him the results of her examination. Based on this initial screening, Plaintiff formed the "impression that the patient was in labor," (Plaintiff's Response, Ex. V, Plaintiff's Aff. at ¶ 7), and he determined that Patient "L" should be admitted to labor and delivery for observation until he could examine her the following morning.

Plaintiff examined Patient "L" at 8:37 a.m. on August 9, 2005, and found that she was fully dilated. His examination further revealed a small amount of amniotic fluid on his examination glove, "which indicated that the membranes were ruptured and the patient was in labor." (*Id.* at ¶ 8.) Based on these findings, Plaintiff determined that the appropriate course of action was "to rupture the for[e]bag and augment labor in order to

10

evacuate the uterus," in light of the "non-viability of the fetus (20 weeks) and out of concern for the mother's safety (risk of infection)."  (*Id.* at ¶ 9.)

A nurse who was assisting Plaintiff, Cheryl Currier, became concerned that Plaintiff's treatment plan appeared to contemplate the rupturing of a patient's membranes after the fetus had a heartbeat, which Nurse Currier viewed as a possible violation of hospital policy.  (*See* Plaintiff's Response, Ex. U, Currier Dep. at 43.)  Currier relayed her concern to her supervisor, who in turn informed Chief Nursing Officer Mango.  Mango then asked Dr. Allen to examine Patient "L," and Dr. Allen reported that her examination disclosed only "hourglassing" and no apparent rupturing of the patient's membranes. (Defendants' Motion, Ex. 33.)[9]  Plaintiff testified that he learned of Dr. Allen's examination only after the fact, and that she did not report her findings to him after her examination.

Defendant Buxton became aware of this matter at some point that day, and spoke to Plaintiff about his plan for treating Patient "L."  During this conversation, Plaintiff expressed his frustration "that nursing staff had gotten involved and that Dr. Allen had been brought in," which had interfered with his ability to manage the care of his patient. (Plaintiff's Response, Ex. D, Buxton Dep. at 151.)  When Buxton noted that it was against hospital policy to "perform an abortion," Plaintiff responded that an abortion was

---

[9]Plaintiff opined at his deposition that Dr. Allen had "lied about her exam," as he viewed her findings as incompatible with the results of his own examination of Patient "L."  (Plaintiff's Response, Ex. B, Plaintiff's Dep. at 132-33.)

11

"inevitable" because "[t]he baby's not viable" and the patient's membranes were "already ruptured."  (*Id.* at 152.)  Buxton, in turn, explained to Plaintiff that "it was obviously a very difficult situation," where another physician, Dr. Allen, had evaluated the patient and determined that her membranes were not ruptured, suggesting the possibility that the fetus "potentially could become viable."  (*Id.* at 154.)

According to Buxton, he suggested that the dilemma could be resolved by transferring Patient "L" to another facility, and Plaintiff agreed to pursue such a transfer. Plaintiff, however, testified that Buxton told him that he "want[ed] that patient . . . transferred out of the hospital," and that he threatened Plaintiff that "if you don't transfer that patient out of here, you may lose your job."  (Plaintiff's Dep. at 23-25.)[10]  Plaintiff further testified that he protested against a transfer of Patient "L," advising Buxton that "she's not stable for transfer" and could "deliver at any point in time."  (Plaintiff's Dep. at 25.)[11]

Despite the parties' divergent accounts, they agree that Plaintiff contacted another hospital and was told that Patient "L" would not be accepted in her present condition as Plaintiff described it.  Buxton followed up with his own phone call, and "the physician on the other end of the phone indicated that if this was . . . an inevitable abortion as Dr.

_____

[10]Buxton has denied making such a threat or ordering Plaintiff to transfer the patient. (*See* Buxton Dep. at 153, 156-57.)

[11]Again, Buxton has denied that Plaintiff told him it was unsafe to transfer the patient. (*See* Buxton Dep. at 153.)  He agreed, however, that Plaintiff told him that transferring the patient in her condition "would be dumping as far as he was concerned."  (*Id.*)

Ritten ha[d] told him it was and that the membranes were ruptured . . . , that there was

nothing they could do for the patient."  (Buxton Dep. at 154-55.)  Although Buxton

indicated during this call that another LRMC physician had reached a different

conclusion, Patient "L" had already gone into active labor before Buxton could arrange

for Dr. Allen to call the other hospital and report her findings.  Patient "L" delivered her

baby later in the afternoon or in the evening of August 9, 2005, but the baby did not

survive.

This incident forms the basis for the federal EMTALA claim asserted in count I of

Plaintiff's complaint, with Plaintiff alleging that his staff privileges were suspended in

retaliation against his refusal to transfer a patient with an emergency condition that had

not been stabilized.[12]  More generally, Plaintiff alleges that the loss of his staff privileges

was attributable, either entirely or at least in part, to Buxton's effort to get back at

Plaintiff for disobeying his order to transfer Patient "L," and for engaging in practices that

Buxton viewed as tantamount to performing elective abortions.

**D.    The Hearing on the Suspension of Plaintiff's Staff Privileges**

In response to Buxton's September 9, 2005 letter notifying him of the Board's

decision to reinstitute the suspension of his staff privileges, Plaintiff requested a hearing

in accordance with the terms of the LRMC's Medical Staff Bylaws.  A hearing committee

---

[12]In addition to the incident involving Patient "L," Plaintiff has identified two other
occasions in the summer of 2004 — involving Patients "N" and "S" — where others sought to
transfer a patient but he refused to do so, citing the patient's unstable condition.  Although he has
referred to these other incidents in his complaint and in other submissions, Plaintiff's EMTALA
claim appears to rest solely upon the incident involving Patient "L."

13

was formed, consisting of three Board members selected by the Board — David

Sommerville, Kathryn Lawter, and Thomas Robinet — and two physicians selected by

the MEC — David Brill, M.D., and Robert Brengel, D.O.[13]  An outside attorney, Gordon

Walker, was engaged to serve as hearing officer.

        The hearing on the suspension of Plaintiff's privileges consisted of eleven four-

hour sessions spanning from November 1, 2005 until June 6, 2006.  The LRMC's

witnesses included Weth, Mango, Dr. Franckowiak, and Dr. Petroff.  Plaintiff offered his

own testimony, as well as the testimony of three other physicians who were presented as

experts.  Both sides were represented by counsel who examined and cross-examined the

witnesses, and members of the hearing committee also posed questions to the witnesses.

After the presentation of testimony and the introduction of numerous exhibits, each side

presented a written closing summary to the hearing committee.

        While this hearing was ongoing, Dr. Allen and Dr. Daly appeared at a January 17,

2006 meeting of the Board of Trustees to raise an issue concerning the care of Plaintiff's

patients when they appeared at the LRMC for treatment.  (*See* Defendants' Motion, Ex.

14, 1/17/2006 Board Meeting Minutes at 2.)  The doctors were asked to set forth their

concerns in a letter to Dr. Reddy, the Chief of Staff, so that Dr. Reddy could in turn send

---

        [13]Although Defendants suggest that this composition of the hearing committee was
"permitted, if not mandated," by the Medical Center Bylaws, (Defendants' Motion, Br. in
Support at 25), Plaintiff correctly points out that the relevant bylaw provision, § 9.04.02, is
poorly written and not at all clear, and certainly does not appear to require that ***any*** Board
members be included on a hearing committee.  (*See* Defendants' Motion, Ex. 1, Medical Staff
Bylaws at 25.)

14

a letter to Plaintiff relaying these concerns. In a resulting letter dated January 20, 2006,

Dr. Allen and Dr. Daly, joined by their Ob/Gyn colleague Dr. Gromada, advised Dr.

Reddy: (i) that "[t]here have been several cases of substandard prenatal care rendered by

[Plaintiff] in high risk obstetrical patients," (ii) that Plaintiff had "fail[ed] to provide

complete and legible prenatal records for the care of his patients," and (iii) that Plaintiff

had made "[d]etrimental comments" to his patients "regarding his current situation and

the physicians who are now caring for his patients," which had "undermine[d] our ability

to foster a good relationship in the care of these patients in labor and delivery."

(Plaintiff's Response, Ex. D-35.)

Dr. Reddy forwarded these concerns to Plaintiff, who responded with a lengthy

January 24, 2006 letter in which he refuted the complaints of his former Ob/Gyn

colleagues and suggested that Dr. Daly, in particular, seemed to be engaged in a

campaign to tarnish the Board's impression of Plaintiff while the hearing on the

suspension of his privileges was still ongoing. (*See* Plaintiff's Response, Ex. D-37.)

Upon looking into the matter and speaking to Plaintiff, Dr. Reddy concluded that the

situation could not be remedied because the lines of communication between Plaintiff and

his former colleagues had already been broken in light of the suspension of Plaintiff's

privileges. (*See* Plaintiff's Response, Ex. M, Reddy Dep. at 101-03.)[14]

---

[14]The January 20, 2006 letter sent by Drs. Allen, Daly, and Gromada forms the basis for
Plaintiff's assertion of a state-law claim of defamation in count IV of his complaint. Plaintiff
also cites this letter in support of his state-law claims of tortious interference as set forth in
counts II and III of his complaint.

15

Following the conclusion of the lengthy hearing process, the hearing committee released its July 18, 2006 decision — as supplemented by a brief statement dated August 3, 2006 — in which it determined "by a majority vote" that the suspension of Plaintiff's staff privileges should be continued.  (*See* Defendants' Motion, Ex. 16.)  The vote of the hearing committee was 3-2, with all of the Board members voting to continue the suspension of Plaintiff's privileges, and the two physician members, Drs. Brill and Brengel, voting to reinstate his privileges.  As the grounds for its decision, the hearing committee cited (i) "the unusual number of incident reports about [Plaintiff] compiled by the [LRMC's] Quality Department," (ii) the "unacceptable care given by [Plaintiff] to many patients which would pose a risk to other [LRMC] patients . . . if it were permitted to continue," (iii) the evidence that Plaintiff's "use of vacuum-assisted deliveries was dramatically in excess of the national norms posing a risk of harm to [LRMC] patients," and (iv) "the general concern about [Plaintiff's] failure to be appropriately concerned about patient safety issues."  (*Id.*)  This decision was affirmed by an appellate review committee, and the Board of Trustees voted on September 21, 2006 to make the suspension of Plaintiff's privileges permanent.

By letter dated September 21, 2006, Buxton informed Plaintiff of the Board's decision and advised him that the suspension of his privileges would be reported to the National Practitioner Data Bank.  (*See* Plaintiff's Response, Ex. D-42.)  Buxton subsequently provided Plaintiff with a copy of the report that he proposed to provide to the Data Bank and invited Plaintiff to meet with him to discuss this proposed language,

(*see* Defendants' Motion, Ex. 17), but Plaintiff did not respond to this invitation.

Accordingly, Buxton submitted the report to the Data Bank.[15]

## III.  ANALYSIS

### A.  The Standards Governing Defendants' Motion

Through their present motion, Defendants seek summary judgment in their favor

on each of Plaintiff's claims.  Under the pertinent Federal Rule, summary judgment is

proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As the Supreme Court has

explained, "the plain language of Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,*

477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a

light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813

(6th Cir. 2006).  Yet, the nonmoving party "may not rely merely on allegations or denials

in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] —

set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

---

[15]This submission forms the basis for Plaintiff's state-law claim of defamation as set forth in count V of his complaint.

17

Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.    Issues of Fact Remain as to Plaintiff's Count I Claim of Retaliation in Violation of the EMTALA.**

Although the first issue raised in Defendants' motion is the availability of immunity under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq.,* the Court elects to defer its consideration of this issue, and to first address Defendants' challenges to Plaintiff's claim of retaliation under the federal Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.  In particular, Defendants contend that the EMTALA does not apply to the LRMC's handling of Patient "L," and that, in any event, the evidence fails to sustain Plaintiff's claim of retaliation under this statute.  The Court, however, finds that issues of fact preclude a determination as a matter of law in Defendants' favor on either of these questions.

As described by the Sixth Circuit, the EMTALA imposes three general sets of requirements upon hospitals with emergency departments:

> Section (a) requires hospitals to provide appropriate medical screening examinations to those who come to emergency rooms.  Section (b) requires hospitals to stabilize patients who have emergency medical conditions or who are in labor, or to transfer them only in accordance with section (c).

18

> Section (c) generally prohibits transfers without a written request and
> waiver by the patient, a signed physician certification, or a qualified
> medical person's certification after consultation with a physician.

*Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 786 (6th Cir. 2003)

(citing 42 U.S.C. § 1395dd(a)-(c)).  In addition, the EMTALA prohibits a hospital from

"penaliz[ing] or tak[ing] adverse action against . . . a physician because the . . . physician

refuses to authorize the transfer of an individual with an emergency medical condition

that has not been stabilized."  42 U.S.C. § 1395dd(i).  In this case, Plaintiff alleges that

Defendant LRMC violated this latter provision by suspending his staff privileges in

retaliation against his refusal to transfer Patient "L" to another hospital.

In a threshold challenge to this claim of retaliation, Defendants argue that the

terms of the EMTALA ceased to apply to the LRMC's care and treatment of Patient "L"

once this patient had been admitted to the hospital's labor and delivery unit.  As

Defendants point out, Patient "L" was admitted to the labor and delivery unit at Plaintiff's

express direction, with instructions that she be kept under observation until Plaintiff could

examine her the following morning.  (*See* Plaintiff's Response, Ex. V, Plaintiff's Aff. at ¶

2.)  In Defendants' view, the admission of Patient "L" triggers the application of the

EMTALA's implementing regulation, which provides that a hospital satisfies its

obligations under the statute once it has "screened an individual . . . and found the

individual to have an emergency medical condition, and admits that individual as an

inpatient in good faith in order to stabilize the emergency medical condition."  42 C.F.R.

§ 489.24(d)(2)(i); *see also Bryant v. Adventist Health System/West,* 289 F.3d 1162, 1168

(9th Cir. 2002) ("We hold that EMTALA's stabilization requirement ends when an individual is admitted for inpatient care."); *Morgan v. North Mississippi Medical Center, Inc.,* 403 F. Supp.2d 1115, 1130 (S.D. Ala. 2005) (holding that "the EMTALA obligation to stabilize a patient ceases at the time of the patient's admission as an inpatient, *unless* the hospital fails to admit the patient in good faith or does so as a subterfuge to avert EMTALA liability").[16]

For a number of reasons, the Court cannot conclude as a matter of law that the admission of Patient "L" to the LRMC's labor and delivery unit defeats Plaintiff's appeal to the EMTALA's protection against retaliation. First, the Department of Health and Human Services ("HHS") has issued "clarifying policies" that caution against treating pregnant women as inpatients — and, hence, generally beyond the reach of the EMTALA — merely because they are routinely sent from the emergency room to the labor and delivery unit for admission, evaluation, and treatment:

> [HHS] believes that EMTALA requires that a hospital's dedicated emergency department would not only encompass what is generally thought of as a hospital's "emergency room," but would also include other departments of hospitals, such as labor and delivery departments and psychiatric units of hospitals, that provide emergency or labor and delivery

---

[16]As Defendants acknowledge, the Sixth Circuit has held to the contrary, reasoning that "[h]ospitals may not circumvent the requirements of the Act merely by admitting an emergency room patient to the hospital," but instead must continue to provide emergency care "until the patient's emergency medical condition is stabilized." *Thornton v. Southwest Detroit Hospital,* 895 F.2d 1131, 1135 (6th Cir. 1990). Nonetheless, Defendants suggest that this decision is no longer good law, in light of the subsequent promulgation of the above-cited federal regulation providing that admission for inpatient care generally discharges a hospital's obligations under the EMTALA. In light of the Court's disposition of this issue on other grounds, it need not address the continuing vitality of the *Thornton* decision.

services, or both, to individuals who may present as unscheduled
ambulatory patients but are routinely admitted to be evaluated and treated.
Because labor is a condition defined by statute as one in which EMTALA
protections are afforded, any area of the hospital that offers such medical
services to treat individuals in labor . . . , even if the hospital's practice is to
admit such individuals as inpatients rather than treating them on an
outpatient basis, *would* be considered a dedicated emergency department
under our revised definition in this final rule.  In such cases, whether the
department of the hospital chooses to directly admit the emergency patient
upon presentment is irrelevant to the determination of whether the
department is a dedicated emergency department.

68 Fed. Reg. 53,222, 53,229 (Sept. 9, 2003).  The practice followed in this case with

respect to Patient "L" appears to comport with the situation addressed in this policy

clarification, where both Plaintiff and the nurse who initially evaluated Patient "L" speak

of having promptly "admitted" this patient to the labor and delivery unit for observation,

before she had been seen by a physician or a course of treatment had been determined.

Under these circumstances, the Court is reluctant to find as a matter of law that Patient

"L" had been admitted for inpatient care, such that the terms of the EMTALA were no

longer applicable.

In any event, the record presented by Defendants is flatly inconsistent with their

appeal to the above-cited regulation.  As noted, this regulation absolves a hospital of any

further obligations under the EMTALA only if it "has screened an individual . . . and

found the individual to have an emergency medical condition," and then has "admit[ted]

that individual as an inpatient in good faith in order to stabilize the emergency medical

condition."  42 C.F.R. § 489.24(d)(2)(i).  Yet, Defendants have ***denied*** that Patient "L"

was found upon initial screening to have an emergency medical condition — to the

21

contrary, the screening nurse, Barbara Wager, states in her affidavit that she "evaluated Patient L and determined that the patient was not in labor." (Defendants' Reply, Ex. 46, Wager Aff. at ¶ 4.)[17]  Similarly, Defendants have taken the position that there was no need to stabilize Patient "L"'s condition before she could be transferred to another hospital.  (*See* Buxton Dep. at 150, 153 (denying that he was told by anyone that Patient "L" was unstable to transfer out of the hospital, and further denying that Plaintiff told him that the patient was not stabilized and could not be safely transferred); *see also* Defendants' Motion, Ex. 33 (Dr. Allen's report of her examination of Patient "L," in which she reports her finding that "the patient did not appear to be ruptured" and states that she discussed with the patient the option of "transfer to another facility").)  Under this record, Defendants can hardly claim — and neither can the Court conclude as a matter of law — that Patient "L" was admitted to the labor and delivery unit for the purpose of stabilizing a recognized emergency medical condition.

In sharp contrast, there is ample evidence that ***Plaintiff*** believed Patient "L" to be suffering from an emergency medical condition that required stabilization.  In particular, Plaintiff states in his affidavit that based on the information relayed to him on the night

---

[17]As noted in the above-quoted HHS clarifying policies, and as confirmed in the EMTALA itself, labor is deemed to be an emergency medical condition.  *See* 42 U.S.C. § 1395dd(e)(1)(B).  In addition, the corresponding regulation broadly defines "labor" as "the process of childbirth beginning with the latent or early phase of labor and continuing through the delivery of the placenta."  42 C.F.R. § 489.24(b).  This regulation further provides that "[a] woman experiencing contractions is in true labor unless a physician, certified nurse-midwife, or other qualified medical person acting within his or her scope of practice as defined in hospital medical staff bylaws and State law, certifies that, after a reasonable time of observation, the woman is in false labor."  42 C.F.R. § 489.24(b).

Patient "L" was admitted to the labor and delivery unit, he formed the "impression that the patient was in labor," and that he confirmed this belief upon examining the patient the following morning.  (Plaintiff's Response, Ex. V, Plaintiff's Aff. at ¶¶ 7-8.)[18]  In addition, he states in his affidavit, and testified at his deposition, that he refused to agree to a transfer of Patient "L" to another hospital because she could have delivered at any time and thus was not stable.  (Plaintiff's Aff. at ¶ 12; *see also* Plaintiff's Dep. at 25.)[19]

While the record discloses a disagreement between Plaintiff and Dr. Allen as to whether Patient "L"'s membranes had ruptured or she was truly in labor, the Court agrees with Plaintiff that this disagreement is irrelevant to Plaintiff's entitlement to protection under the EMTALA's anti-retaliation provision.  The statute prohibits taking adverse action against a physician who "refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized."  42 U.S.C. § 1395dd(i).  Under the analogous Title VII provision that prohibits retaliation against an employee who has opposed an unlawful employment practice, *see* 42 U.S.C. § 2000e-3(a), "a violation . . . can be found whether or not the challenged employment practice ultimately is found to be unlawful," so long as the employee has a "reasonable and good faith belief that the opposed practices were unlawful."  *Johnson v. University of Cincinnati,* 215 F.3d

_____

[18]In light of these statements, the Court fails to see how Defendants can credibly contend that "Plaintiff never claims the patient was in labor."  (Defendants' Reply Br. at 8.)

[19]Under the regulatory language noted earlier, of course, once Plaintiff determined that Patient "L" was in labor, she would be deemed to remain in labor until a qualified medical professional certified that she was in false labor.  There is no evidence of such a certification in the record.

561, 579-80 (6th Cir. 2000) (internal quotation marks and citation omitted).  Likewise, the protection of the EMTALA surely must extend to a physician who reasonably believes that a patient is suffering from an emergency medical condition that has not been stabilized and who opposes a transfer on this ground, even if it is subsequently determined that the patient did not suffer from such a condition or that any such condition had been stabilized.[20]  Consequently, the Court rejects Defendants' contention that the EMTALA does not apply to the LRMC's handling of Patient "L."

For similar reasons, the Court readily rejects Defendants' assertion that Plaintiff's EMTALA retaliation claim is defeated by the absence of evidence of the LRMC's "actual knowledge" of Patient "L"'s emergency medical condition.  *See Roberts,* 325 F.3d at 786 (explaining that a hospital cannot be held liable for a breach of the duty to stabilize a patient absent its "actual knowledge" of an emergency medical condition that requires stabilization).  In Defendants' view, the requisite showing of actual knowledge is defeated by Plaintiff's own testimony that Buxton chose to credit Dr. Allen's findings over Plaintiff's assessment of Patient "L"'s condition.  Yet, a hospital can hardly disclaim actual knowledge of an emergency medical condition when it is expressly told of such a condition by a treating physician, but then chooses to disregard this finding in favor of

_____

[20]Notably, in this case, nothing in the record conclusively disproves Plaintiff's assessment of Patient "L"'s condition.  To the contrary, this assessment seemingly was proven correct when the patient delivered a baby later that day without any apparent medical intervention to bring about this result.  Moreover, the hospital to which Buxton sought to transfer Patient "L" evidently shared Plaintiff's belief that a transfer was inappropriate, at least if the patient's condition was as Plaintiff described it.

24

another physician's divergent opinion.  And, again, regardless of what Buxton or some

other physician might have believed about Patient "L"'s condition, the Court construes

the EMTALA's anti-retaliation provision as extending to a physician, such as Plaintiff,

who reasonably determines that a patient is suffering from an emergency condition that

has not been stabilized.  A hospital is not free to discount a physician's reasonable

evaluation and then retaliate against the physician with impunity, on the ground that it did

not accept or agree with the physician's stated finding of an emergency medical

condition.

Next, Defendants suggest that Plaintiff cannot establish a *prima facie* case of

retaliation, and also cannot establish that the LRMC's stated non-retaliatory reason for

suspending his privileges is pretexual.  As the parties observe, there is no case law

addressing the standards that should govern a claim under the EMTALA's anti-retaliation

provision, so both sides have agreed that it is appropriate to analyze Plaintiff's claim

under the standards that govern Title VII claims of retaliation.  Under this analogous case

law, a plaintiff "may establish retaliation either by introducing direct evidence of

retaliation or by proffering circumstantial evidence that would support an inference of

retaliation."  *Imwalle v. Reliance Medical Products, Inc.,* 515 F.3d 531, 543 (6th Cir.

2008).  In the absence of direct evidence, a plaintiff's claim of retaliation is analyzed

under the familiar evidentiary framework adopted by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  *See Imwalle,*

515 F.3d at 544.

The Court agrees with Plaintiff that the record here features direct evidence of retaliation, such that there is no need to proceed under the *McDonnell Douglas* approach. According to Plaintiff, Buxton told him that "if you don't transfer that patient out of here, you may lose your job." (Plaintiff's Dep. at 23; *see also id.* at 356.) Roughly three weeks later, Buxton summarily suspended Plaintiff's staff privileges at LRMC, thereby terminating his ability to practice at this hospital. If a trier of fact were to accept Plaintiff's testimony that Buxton threatened him with the loss of his job if he failed to transfer Patient "L," no inferences would be required to conclude that Plaintiff's refusal to transfer the patient "was a motivating factor" in Buxton's decision to suspend his privileges. *Imwalle,* 515 F.3d at 544. Rather, the trier of fact could readily and directly conclude that Buxton had done precisely what he threatened to do.

In an effort to avoid this result, Defendants suggest that Buxton's purported statement was too "ambiguous" to qualify as direct evidence of his motive for suspending Plaintiff's staff privileges. *See, e.g., White v. Columbus Metropolitan Housing Authority,* 429 F.3d 232, 239 (6th Cir. 2005) (explaining that ambiguous comments do not constitute direct evidence of discrimination). As evidence of this ambiguity, Defendants point to Plaintiff's own assertions in his response brief that Buxton was angry at him, not because he refused to transfer Patient "L," but rather because he viewed Plaintiff's treatment plan for this patient as tantamount to performing an elective abortion in violation of hospital policy. It follows, in Defendants' view, that there are questions about Buxton's motives for his actions, questions that are not resolved by Buxton's alleged threat.

26

Such questions, however, do not render Buxton's statement ineligible for treatment as direct evidence of a retaliatory motive. On its face, this statement disclosed Buxton's intent to take adverse action if Plaintiff refused to transfer Patient "L" to another hospital. It is utterly immaterial *why* Buxton formed this intent, and any uncertainty in the record as to this separate question simply does not affect the "direct evidence" inquiry. Under the EMTALA, Plaintiff was protected against retaliation for refusing to authorize the transfer of a patient who, in his medical judgment, was suffering from an emergency medical condition that had not been stabilized. Plaintiff has testified that he made such a judgment as to Patient "L," and that he conveyed this assessment to Buxton as the reason for opposing a transfer. The "ambiguities" identified by Defendants raise questions only as to whether Buxton agreed with this assessment of Patient "L"'s condition — in other words, whether he believed that Plaintiff's claim of protected activity was legitimate — or whether he instead believed that Plaintiff had misstated this patient's condition in order to justify his determination to perform an elective abortion. Yet, as explained, the availability of protection under the EMTALA's anti-retaliation provision does not hinge upon the ultimate correctness of a physician's medical judgment that a patient should not be transferred. Neither, then, can the statute's protection turn upon whether a hospital official agrees or disagrees with this judgment — either way, adverse action is not permitted. It is enough, then, that Buxton's purported statement forged a direct and explicit link between a refusal to transfer a patient and a resulting adverse action.

To be sure, Defendants remain free to attempt to persuade the trier of fact that

27

Buxton did not make the statement Plaintiff attributes to him.  Alternatively, they may seek to show that, despite this statement, Buxton's subsequent decision to suspend Plaintiff's privileges was based on factors other than Plaintiff's refusal to transfer Patient "L."  They may also attempt to cast doubt upon the reasonableness of Plaintiff's claimed belief that Patient "L" was suffering from an emergency medical condition.  Nonetheless, these are all questions for the trier of fact to decide, where Plaintiff has produced direct evidence of an impermissible ground for the suspension of his staff privileges — namely, that this action was taken in response to Plaintiff's refusal to transfer a patient under circumstances that he believed would violate the EMTALA.

Finally, Defendants suggest that Plaintiff's direct evidence of retaliatory motive necessary extends only to Buxton's own decision to suspend Plaintiff's staff privileges, and not to the subsequent decisions by the Board of Trustees and the hearing committee to continue this suspension.  As to the action by the Board of Trustees, however, it bears emphasis (i) that Buxton was a member of the Board, (ii) that he evidently called for the meeting at which the Board decided whether to reinstate Buxton's summary suspension of Plaintiff's privileges, and (iii) that he addressed the Board at this meeting, providing "his account of how he came to place a summary suspension on" Plaintiff.  (Defendants' Motion, Ex. 10, 9/9/2005 Board Meeting Minutes at 1.)  In addition, there is evidence that, prior to the Board meeting, Buxton told at least one other Board member about Plaintiff's refusal to transfer Patient "L."  (*See* Plaintiff's Response, Ex. N, Lawter Dep. at 99-100.)  Under this record, "a reasonable jury could conclude that [Buxton] was in a

28

position to influence" the Board's decision to reinstate the suspension of Plaintiff's privileges. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 355 (6th Cir. 1998).

Buxton's role in the subsequent hearing committee process, in contrast, was surely more limited. Yet, even assuming that he had no opportunity to inject his purportedly retaliatory motives into this process, Plaintiff's staff privileges had already been summarily suspended for nearly a year before the hearing committee reached its decision to continue this suspension. Defendants have not identified any authority for the proposition that such an extended suspension of privileges would fail to qualify as a "penal[ty]" or "adverse action" under the EMTALA's anti-retaliation provision. Accordingly, the Court finds that Defendants are not entitled to summary judgment in their favor on Plaintiff's claim of retaliation under this statute.

**C.    Defendants' Entitlement to HCQIA Immunity Encompasses Only the Final Stage of the Process Through Which Plaintiff's Privileges Were Suspended, and Not the Initial Suspension of Plaintiff's Privileges Prior to a Hearing.**

**1.    The Standards Governing Defendants' Claim of HCQIA Immunity**

The Court now returns to the principal argument advanced in Defendants' motion — namely, that they are shielded from liability under some or all of the theories advanced in Plaintiff's complaint, in light of the immunity conferred under the federal Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq.,* for decisions reached in a hospital's professional review process. Under this statute, if a "professional review action" meets certain specified standards, then the professional review body that took the

action, the members of and staff to this body, and "any person who participates with or assists the body with respect to the action" is immune from "liab[ility] in damages under any law of the United States or of any State . . . with respect to the action." 42 U.S.C. § 11111(a)(1).[21]

To secure the immunity offered under the HCQIA, the "professional review action" in question must have been taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3).

42 U.S.C. § 11112(a). The statute further establishes a presumption that a professional review action has met these standards, and thus qualifies for immunity, "unless the presumption is rebutted by a preponderance of the evidence." 42 U.S.C. § 11112(a).

---

[21]The HCQIA defines a "professional review action" as

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9).

As the Sixth Circuit has observed, the HCQIA's rebuttable presumption "creates an unusual summary judgment standard," under which a court must ask whether "a reasonable jury, viewing the facts in the best light for the plaintiff, [could] conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)." *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461, 468 (6th Cir. 2003) (internal quotation marks, alterations, and citations omitted). In determining whether a professional review action meets the criteria of § 11112(a), the courts apply "an objective standard, rather than a subjective good faith requirement." *Meyers,* 341 F.3d at 468.

> **2.    The Ultimate Decision of the Hearing Committee to Suspend Plaintiff's Privileges Meets the Standards for HCQIA Immunity, but Issues of Fact Remain as to Whether the Earlier Decisions by Buxton and the Board of Trustees Are Also Shielded by Immunity.**

> **(a)    Buxton's Initial Decision to Suspend Plaintiff's Privileges**

Against this legal backdrop, the Court turns to the decisions by Buxton, the Board of Trustees, and the hearing committee to suspend — and, in turn, to reinstate and continue the suspension of — Plaintiff's staff privileges. Having addressed Buxton's initial decision in detail in the context of Plaintiff's EMTALA claim of retaliation, little further analysis is needed to find that this decision does not meet the standards for HCQIA immunity, at least not as a matter of law.[22]

---

[22]The Court observes, as a threshold matter, that this decision likely would not be eligible for HCQIA immunity even if it met the standards of § 11112(a). As noted above, only "professional review actions" qualify for immunity, and such actions, by definition, must be

First, there is sufficient evidence in the record from which a trier of fact could conclude that Buxton did not make this decision "in the reasonable belief that the action was in furtherance of quality health care," but rather on less appropriate — and, indeed, legally impermissible — grounds.  As explained earlier, Plaintiff has raised genuine issues of fact as to whether Buxton suspended his privileges in retaliation against his EMTALA-protected refusal to transfer a patient who was suffering from an emergency medical condition that had not been stabilized.  If Buxton acted on this basis, a trier of fact could readily conclude that such a decision was not grounded in considerations of quality health care, but instead upon an unfounded belief that Plaintiff was performing elective abortions in violation of LRMC policy.

To be sure, there was some basis for Buxton to question whether Patient "L" had an emergency medical condition that would prevent her transfer.  In particular, the examination performed by Dr. Allen suggested otherwise.  Yet, even so, a trier of fact could nonetheless conclude that Buxton's decision failed to satisfy the second prong of the HCQIA immunity standard — namely, that this decision was made "after a reasonable effort to obtain the facts of the matter."  As Buxton describes his dilemma at the time, he

---

taken by a "professional review body."  It is doubtful that a decision by Buxton alone would constitute a "professional review action" under this standard.  It also is worth noting that a grant of HCQIA immunity here would not altogether defeat Plaintiff's EMTALA claim of retaliation, since Plaintiff seeks both compensatory and equitable relief under this count of his complaint, and the HCQIA confers immunity only from liability for damages.  *See* 42 U.S.C. § 11111(a); *see also Singh v. Blue Cross/Blue Shield of Massachusetts, Inc.,* 308 F.3d 25, 44 (1st Cir. 2002) (explaining that "HCQIA immunity only covers liability for damages," and "does not shield covered defendants from suit and other forms of relief").

had been presented with two opposing opinions of Plaintiff and Dr. Allen, one of whom found that the patient's membranes were ruptured and one of whom determined that they were not. (*See* Buxton Dep. at 154.) Yet, he made no apparent effort to resolve this dilemma — he testified, for example, that he did not contact Dr. Allen directly at the time to inquire how her evaluation could differ in such an important respect from Plaintiff's assessment. (*See id.* at 156.) Instead, he evidently chose Dr. Allen's opinion over Plaintiff's, without any explanation in the record for doing so. Even afterward, Defendants have not pointed to any evidence that Buxton tried to get to the bottom of this matter. A trier of fact could find that this was not a reasonable investigation of the facts under the circumstances.

Even if the trier of fact were to conclude that Buxton's decision to suspend Plaintiff's privileges was not made in retaliation against Plaintiff's refusal to transfer Patient "L," but rather was based on the data compiled as the LRMC prepared to decide whether Plaintiff's privileges should be renewed for another two-year term, there still would be an evidentiary basis for concluding that Buxton failed to make a "reasonable effort to obtain the facts" before he summarily suspended Plaintiff's privileges. When this data first came to light, revealing both a high number of incident reports about Plaintiff and a "patient safety indicators" report that seemingly disclosed a high trauma rate for Plaintiff's vacuum deliveries, it was determined at a meeting among Buxton, Weth, and two physicians — the Chair of the Credentials Committee, Dr. Franckowiak, and the Chair of the Quality Committee, Dr. Dombroske — that an outside obstetrician

33

should review the materials concerning Plaintiff.  Buxton selected Dr. Petroff for this

task, and he, in turn, asked to be provided the medical records for about 90 of Plaintiff's

patients.

Yet, the record is clear that Dr. Petroff's review of the requested record was still

ongoing when Buxton made his decision in September 2, 2005 to summarily suspend

Plaintiff's staff privileges.  What is more, Dr. Petroff's review had discounted one of the

two concerns that motivated the retention of an outside consultant, with Dr. Petroff

concluding that the high trauma rate shown on the "patient safety indicators" report was

too high and reflected coding errors.[23]  Although he had instead identified a different

concern — namely, that Plaintiff's rate of vacuum delivery appeared to be high — he was

continuing to look into this matter, and he characterized his concern as stemming, in large

part, from his inability to tell from the medical records that had been provided whether

Plaintiff had identified a sufficient justification for his greater use of this technique.  (*See*

Petroff Dep. at 140 (explaining the "difficulty" he was experiencing "with any

determination that standard of care was met," where the requisite information for this

determination "just didn't exist" in the records he was given).)  Under this record, a trier

of fact could find that Buxton acted without awaiting the development of a more complete

record, and without any seeming need to act as precipitously as he did.

---

[23]As to the other concern — that Plaintiff was the subject of a high number of incident
reports — Dr. Petroff evidently made no particular effort to determine the validity of this
concern or investigate the facts underlying these reports.

Finally, a trier of fact could also conclude that Buxton lacked a "reasonable belief that the [summary suspension of Plaintiff's privileges] was warranted by the facts known" to him at the time. As stated in his letter to Plaintiff announcing this decision, Buxton concluded that Plaintiff's practice "pose[d] a substantial likelihood of immediate injury to the health of patients," and he cited "[i]n particular" Plaintiff's "numerous, unnecessary instrument-assisted deliveries." (Plaintiff's Response, Ex. D-13.) Again, however, Dr. Petroff's record review was still in progress at the time, and he acknowledged that his principal concern was that he could not tell whether Plaintiff's high rate of vacuum deliveries was justified. In addition, there seemingly was little or no evidence available to Buxton at the time to suggest that Plaintiff's high rate of vacuum deliveries, in and of itself, posed a "substantial likelihood of immediate injury to the health of patients." To the contrary, Plaintiff has produced evidence that Plaintiff's rate of vacuum deliveries was not significantly higher than Dr. Daly's rate of such deliveries in the relevant time frame. (*See* Plaintiff's Response, Ex. D-14.) In addition, Plaintiff has offered the opinions of multiple experts that vacuum deliveries, in and of themselves, pose no especially heightened risk to patient health and well-being. Thus, Defendants are not entitled to immunity from liability under the HCQIA for Plaintiff's claims arising from Buxton's initial suspension of his staff privileges.

        **(b)**    **The Board's Decision to Reinstate the Suspension of Plaintiff's Privileges**

Following Buxton's initial decision on Friday, September 2, 2005 to summarily

suspend Plaintiff's privileges, the Medical Executive Committee ("MEC") met on Tuesday, September 6, 2005, and promptly voted to rescind this summary suspension. Just three days later, however, the Board of Trustees convened a special meeting and voted to reinstate the summary suspension of Plaintiff's privileges as initially imposed by Buxton. Upon measuring this action against the standards of § 11112(a), the Court again concludes that Plaintiff has produced sufficient evidence from which a trier of fact could find that these standards were not met.

As to the requirement that an action be taken "after a reasonable effort to obtain the facts of the matter," it can at least be said that the Board's decision was based on a more complete factual record than the one available to Buxton a few days earlier. First, the Board minutes reflect that "Dr. Petroff gave a full account of his review of the charts that were forwarded to him," (Defendants' Motion, Ex. 10, 9/9/2005 Board Meeting Minutes at 3), suggesting that Dr. Petroff's review was by then completed. He also provided more specific information about the concerns he had identified in his review. In addition, the Board heard from Chief Nursing Officer Mango and Dr. Daly regarding their specific experiences with Plaintiff, with Mango, in particular, detailing instances of apparently questionable care.

Yet, while the Board heard a more thorough explanation of what Dr. Petroff's review had revealed and the basis for his concerns about Plaintiff's practice, this presentation also raised some seemingly obvious questions that the Board evidently did not pursue. As noted earlier, Plaintiff's rate of vacuum deliveries was not substantially

36

different from the rate of at least one other LRMC Ob/Gyn, Dr. Daly, but the record does

not disclose that the Board inquired about how Plaintiff's practices might differ from

those of his colleagues or what the explanation for such differences might be.  Such

further inquiry would seem particularly appropriate here, where Dr. Petroff presented

literature to the Board reflecting a heightened risk associated with vacuum deliveries and

also suggested that the LRMC might face additional liability in the future because of

Plaintiff's use of this technique, and where several Board members evidently gave Dr.

Petroff's presentation significant weight in their decision to reinstate the suspension of

Plaintiff's privileges.

Moreover, although Dr. Petroff's concerns were based in part upon his inability to

determine from his record review whether Plaintiff had a sufficient justification for his

use of vacuum extraction in any given case, there is no indication in the record that the

Board explored any options for shedding additional light on this issue.  It was later

revealed, for example, that because of the limited time allotted for his record review, Dr.

Petroff had not been provided with any fetal heart monitoring strips that might have

supplied the missing justification for vacuum deliveries in some cases.  And, of course,

Plaintiff himself might have been able to explain his decisionmaking process in the cases

that gave rise to Dr. Petroff's concerns, but he was not invited to address the Board.[24]

_____

[24]At oral argument, defense counsel emphasized that Plaintiff was not entitled under the
LRMC's Medical Staff Bylaws to appear before the Board.  Counsel further noted that HCQIA
immunity is not necessarily forfeited by the absence of notice and a hearing prior to a summary
suspension of privileges, providing that certain conditions are met.  *See* 42 U.S.C. § 11112(c).
Yet, regardless of whether Plaintiff's appearance before the Board was required, and regardless

Under these circumstances, the Court finds that a trier of fact could conclude that the Board's fact-gathering efforts were not reasonable.

The Court further holds that Plaintiff has produced sufficient evidence to rebut the presumption that the Board acted "in the reasonable belief that [its] action was warranted by the facts known" to it at the time. Importantly, by the time of the September 9, 2005 special board meeting, the MEC had determined that Plaintiff's staff privileges should be reinstated, with the conditions that a preceptor be appointed to supervise his operative deliveries and that certain of his cases be reviewed by an outside consultant. The Board also heard from Dr. Reddy, the Vice-Chief of Staff, who explained the reasons for the MEC's vote to reinstate Plaintiff's staff privileges, expressed the MEC's concern that Plaintiff should be given the opportunity to address the concerns about his practice, and explained that this was the reason for the MEC's selection of a preceptor to supervise Plaintiff's operative deliveries.

Despite the recommendation of the MEC and Dr. Reddy's explanation on this point, the Board voted to reinstate the suspension of Plaintiff's privileges, evidently concluding that the conditions recommended by the MEC were inadequate to alleviate the Board's concerns regarding Plaintiff's practice.[25] The record is utterly silent, however, as

_____

of whether HCQIA immunity might be available despite Plaintiff's absence from the September 9, 2005 meeting, a trier of fact certainly could consider this absence as a factor in determining whether the Board made a reasonable effort to obtain the pertinent facts.

[25]One Board member, Robert Champion, expressly testified at his deposition that he voted to reinstate the suspension of Plaintiff's privileges because the appointment of a preceptor "was not an acceptable solution to the problem." (Plaintiff's Response, Ex. T, Champion Dep. at

to **why** the appointment of a preceptor would have been ineffective to address these concerns, particularly the ones raised by Dr. Petroff.  Nothing in the minutes of the Board meeting or the subsequent executive session sheds any light whatsoever on this question. Rather, the minutes from the executive session address only the MEC's other recommendation — namely, that an outside consultant should review certain of Plaintiff's past "cases of concern."  As to this recommendation, the minutes reflect the Board's opinion that such a review "could take up to a year to complete," and that the Board "could not wait this long" while allowing the MEC's recommended course of action to remain in effect.  (Plaintiff's Response, Ex. D-20.)

The effect of this decision, of course, was that the Board's summary suspension of Plaintiff's privileges remained in effect for a year while the parties pursued a lengthy hearing process.  While this might well be warranted under a record evidencing a substantial risk to patient health and well-being if Plaintiff were permitted to practice in the interim, a trier of fact could reasonably conclude that the Board's decision lacked this sort of factual support.  As Plaintiff points out, the Board evidently was not presented with any evidence of harm caused to a patient by Plaintiff's practices to date, and no Board member contended otherwise at his or her deposition.  To the extent that Plaintiff's practices were deemed likely to cause such harm in the future, a trier of fact could conclude that the Board lacked a reasonable basis for rejecting the MEC's determination

---

63.)  Champion did not elaborate on this conclusion, however, at least in the portion of his deposition that has been provided to the Court.

that proctoring was an adequate safeguard against this risk.  Finally, and as discussed

earlier, a trier of fact certainly could question the extent to which Buxton might have

brought his allegedly retaliatory motives to bear upon the Board's decisionmaking

process at its September 9 special meeting.  Consequently, the Court cannot say as a

matter of law that the Board's reinstatement of the suspension of Plaintiff's staff

privileges meets the standards for immunity under the HCQIA.

### (c)   The Hearing Committee's Decision to Continue the Suspension of Plaintiff's Staff Privileges

The final candidate for HCQIA immunity in this case is the July 18, 2006

determination of the hearing committee that the suspension of Plaintiff's staff privileges

should be continued.  Although the question is a close one, the Court finds that Plaintiff

has failed to produced sufficient evidence from which a trier of fact could conclude that

this decision fell short of the criteria set forth at § 11112(a) for a grant of immunity.

In contrast to the summary and rather hurried decisions of Buxton and the Board, it

is clear that the hearing process provided under the LRMC's Medical Staff Bylaws

afforded Plaintiff a far greater opportunity to present facts, information, and argument in

support of his effort to regain his staff privileges.  It also is evident that Plaintiff took full

advantage of this opportunity, where he was represented by counsel, offered lengthy

testimony on his own behalf, and presented the testimony of three expert physicians.

More generally, Plaintiff has not identified any instance in which he was denied a chance

to offer any evidence he wished on behalf of his cause, or to contest the evidence offered

by the LRMC in support of its opposing position.  Finally, while the Court has noted that

the presentation at the September 9, 2005 Board meeting was incomplete in certain

respects — *e.g.,* Dr. Petroff had not reviewed all of the medical records that seemingly

were relevant to the concerns he had raised about Plaintiff's practices — these

deficiencies were (or, at a minimum, could have been) addressed during the course of the

lengthy hearing process.

Nonetheless, Plaintiff contends that the hearing committee's development of a

factual record was impeded by various purported efforts to "poison the well" during the

course of the hearing process.  Plaintiff points, for example, to the appearance of Drs.

Allen and Daly at a January 17, 2006 meeting of the Board,[26] where they raised concerns

that had arisen in the care of Plaintiff's patients when they appeared at the LRMC for

treatment.  Plaintiff further cites (i) Buxton's accusation — which he shared with the

Board — that Plaintiff had behaved inappropriately at a September 26, 2005 Department

of Surgery meeting, (*see* Plaintiff's Response, Ex. D-25),[27] and (ii) a December 29, 2005

letter by the LRMC's attorney to Plaintiff — again, copied to the Board — accusing

Plaintiff of making defamatory comments about Dr. Daly, (*see* Plaintiff's Response, Ex.

D-33).

One certainly can question the propriety of such communications about Plaintiff to

---

[26]As noted earlier, three members of the hearing committee also were members of the
Board.

[27]As Plaintiff points out, this accusation was later discredited by the Chair of the
Department, Dr. Stenz.  (*See* Plaintiff's Response, Ex. D-26.)

41

members of the hearing committee, made while the hearing was still ongoing and yet outside the hearing process.  Nonetheless, because this process had not yet concluded, Plaintiff had an opportunity to address the matters raised in these communications, and to present any evidence or argument he wished in support of his position on these matters. Under these circumstances, the Court finds that Plaintiff has failed to rebut the presumption that the hearing committee made "a reasonable effort to obtain the facts of the matter" before rendering its decision.

Similarly, the Court finds insufficient evidence in the record to rebut the presumption that Plaintiff was afforded "adequate notice and hearing procedures" in the process leading up to the hearing committee's decision.  As discussed earlier, it is noteworthy (and troubling) that Plaintiff was not invited to speak on his own behalf at the September 9, 2005 special meeting where the Board decided to reinstate the suspension of his privileges.  Again, however, this defect was remedied in the hearing process, with Plaintiff offering lengthy testimony and presenting other witnesses and numerous exhibits in support of his position.

Plaintiff, however, mounts two challenges to the procedural fairness of the hearing process.  First, he argues that Board member Kathryn Lawter should have been removed from the hearing committee after she was copied on the letter in which the LRMC's counsel accused Plaintiff of defaming Dr. Daly.  Next, and more generally, he contends that no Board members should have served on the hearing committee, where they had previously participated in the decision to summarily suspend Plaintiff's staff privileges.

42

Although these considerations perhaps undermine the appearance of fairness of the hearing process to some degree, the Court cannot conclude that they overcome the presumption that this process was at least "adequate" to ensure Plaintiff's opportunity to advocate for the reinstatement of his staff privileges.

The closer question, however, is whether the hearing committee acted "in the reasonable belief" that the continued suspension of Plaintiff's privileges "was in furtherance of quality health care," § 11112(a)(1), and "in the reasonable belief that [this] action was warranted by the facts known after" a reasonable effort to obtain facts and after affording adequate notice and a hearing, § 11112(a)(4). The Sixth Circuit has explained that the inquiries under these two elements of the § 11112(a) standard overlap to a significant degree, and that a professional review body's decision should be assessed under "an objective standard, rather than a subjective good faith requirement." *Meyers,* 341 F.3d at 468, 471; *see also Brader v. Allegheny General Hospital,* 167 F.3d 832, 840 (3d Cir. 1999) (observing that "the good or bad faith of the reviewers is irrelevant," and that "[t]he real issue is the sufficiency of the basis for the [reviewer's] actions" (internal quotation marks and citation omitted)). "The 'reasonable belief' standard of the HCQIA is satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Meyers,* 341 F.3d at 468 (internal quotation marks and citations omitted). This standard "does not require that the professional review result in an actual improvement of the quality of health care, nor does

43

it require that the conclusions reached by the reviewers were in fact correct." *Poliner v. Texas Health Systems,* 537 F.3d 368, 378 (5th Cir. 2008) (internal quotation marks and footnotes with citations omitted).

In arguing that the hearing committee's decision does not meet this "reasonable belief" standard, Plaintiff cites a number of purported "red flags" attendant to this decision. First, Plaintiff emphasizes that only the non-physician members of the hearing committee — Board members David Sommerville, Kathryn Lawter, and Thomas Robinet — voted to continue the suspension of Plaintiff's privileges, while the two physicians on the committee — Drs. Brill and Brengel — voted in favor of reinstatement. None of the three Board members has any medical background or training: Lawter and Sommerville have associate's degrees, and Robinet has a high school education.

Yet, the case law does not require that a "reasonable belief" be based on a foundation of expertise or specialized knowledge comparable to that of the physician under scrutiny or his supporting colleagues or experts. As the Fourth Circuit explained in rejecting a similar contention, "even if [the plaintiff physician] could show that [the members of a review panel] reached an incorrect conclusion on a particular medical issue because of a lack of understanding, that does not meet the burden of contradicting the existence of a *reasonable belief* that they were furthering health care quality in participating in the peer review process." *Imperial v. Suburban Hospital Association, Inc.,* 37 F.3d 1026, 1030 (4th Cir. 1994). More generally, another court has observed that "[d]emonstrating the existence of a triable issue of fact over whether a plaintiff actually

44

performed deficiently is irrelevant," and that the plaintiff instead must "demonstrate that there exists a triable fact as to whether the result reached by the peer review board was based on a 'reasonable belief' that it 'was in furtherance of quality health care." *Reyes v. Wilson Memorial Hospital,* 102 F. Supp.2d 798, 813 (S.D. Ohio 1998).

In this case, Plaintiff had ample opportunity to educate the hearing committee's lay members as to the governing standard of care, and to persuade them to adopt his and his experts' view of the record over the testimony and evidence suggesting that he had deviated from this standard in the past and posed a risk of harm to LRMC patients. Moreover, in stark contrast to the September 9, 2005 special board meeting that he was not invited to attend, Plaintiff had a full and fair opportunity in the course of the lengthy hearing process to challenge the witnesses — most notably, Dr. Petroff — who questioned his practices as purportedly lying outside national norms. Finally, it bears emphasis that while the MEC, composed of fellow physicians, voted to reinstate Plaintiff's privileges, it did not do so unconditionally, but instead determined that a preceptor should be appointed to supervise Plaintiff's operative deliveries and that some of his cases should be reviewed by an outside consultant. Thus, it cannot be said that Plaintiff's practices raised no concerns among his peers, and the lay members of the hearing committee surely were entitled to share (and act upon) these same concerns.[28]

---

[28]It also is worth noting that the hearing committee's decision was based, at least in part, upon matters that entailed no medical judgments about proper standards of care. Most notably, the hearing committee expressed its concern about "the unusual number of incident reports about [Plaintiff] compiled by the [LRMC's] Quality Department." (Defendants' Motion, Ex. 16.) The Sixth Circuit has explained that "quality health care" within the meaning of the HCQIA "is not

Plaintiff next suggests that the reasonableness of the hearing committee's decision is undermined by the evidence that extraneous facts and considerations might have played a role in the votes of one or more committee members. David Sommerville testified, for example, that he did not rely solely on the evidence presented in the hearing process, but also spoke to a friend who was a retired Ob/Gyn, and who opined that he would "[a]bsolutely not" rupture a membrane without a nurse present and had "hardly ever" ruptured a membrane artificially. (Plaintiff's Response, Ex. O, Sommerville Dep. at 162-67.) Kathryn Lawter testified to a conversation with Buxton about the incident involving Patient "L," with Buxton providing his rationale for why he wanted this patient transferred to another hospital. (Plaintiff's Response, Ex. N, Lawter Dep. at 99-101.)[29] The third Board member on the hearing committee, Thomas Robinet, testified to his awareness of such extrinsic issues as Buxton's accusation that Plaintiff had behaved inappropriately at a Department of Surgery meeting, the accusation by an LRMC attorney that Plaintiff had defamed Dr. Daly, and the statements by Drs. Daly and Allen before the Board regarding issues with Plaintiff's patients after his privileges had been suspended, and he acknowledged that these matters caused him to form a negative view of Plaintiff.

---

limited to clinical competence." *Meyers,* 341 F.3d at 469.

[29]Sommerville also testified that the incident involving Patient "L" played a role in his decision, but he stated that, so far as he could recall, he learned of this incident solely through the hearing process. (*See* Sommerville Dep. at 191-95.)

(*See* Plaintiff's Response, Ex. P, Robinet Dep. at 55-59.)[30]

Even viewing this evidence of extrinsic influences in a light most favorable to Plaintiff, however, it would tend, at most, to call into question the motives for the decisions reached by the lay members of the hearing committee. Indeed, the Court already has noted the evidence that Defendant Buxton, at least, might have acted with questionable motives in pursuing the suspension of Plaintiff's privileges, and readily acknowledges the possibility that Buxton continued to press this agenda in the course of the hearing process. Yet, as explained, the inquiry under § 11112(a) is an objective one, and the courts have held that charges of bias, bad faith, hostility, self-interest, and other subjective motivations are not relevant to the application of this objective standard. *See, e.g., Poliner,* 537 F.3d at 379-80 & n.37; *Sugarbaker v. SSM Health Care,* 190 F.3d 905, 914 (8th Cir. 1999); *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318, 1335 (11th Cir. 1994); *Bakare v. Pinnacle Health Hospitals, Inc.,* 469 F. Supp.2d 272, 287-88 (M.D. Pa. 2006). Rather, the key question is whether there was a sufficient basis in the record to permit the reasonable belief that the suspension of Plaintiff's privileges was warranted, *see Brader,* 167 F.3d at 840; *Bryan,* 33 F.3d at 1334-35, and Plaintiff has not rebutted the presumption that there was. Moreover, as observed earlier, Plaintiff had sufficient opportunity in the lengthy hearing process to blunt the impact of any extrinsic

---

[30]Similarly, Sommerville testified that he had received a copy of the January 20, 2006 letter in which Drs. Allen, Daly, and Gromada raised concerns about Plaintiff following the suspension of his privileges, and he acknowledged that this letter left him with a negative impression of Plaintiff. (*See* Sommerville Dep. at 146-48.)

influences that were brought to bear on the committee members.

Finally, Plaintiff points to evidence suggesting that the Board members on the hearing committee might have prejudged the outcome of the process, and might not have paid proper heed to the testimony and evidence that challenged the validity of the negative assessments of Plaintiff's practices — most notably, by Dr. Petroff. One of the two physicians on the committee, Dr. Brill, testified to his opinion that the three Board members had made up their minds before the hearing process had even begun, that the deliberations at the conclusion of the hearing process could have been done "in a minute," and that the three Board members did not appear to be listening to the views of the two physicians on the committee. (Plaintiff's Response, Ex. R, Brill Dep. at 38-39.) Likewise, the other physician on the committee, Dr. Brengel, believed that the "board of trustees felt the need to circle the wagons" and "[d]efend their initial decision" to suspend Plaintiff's privileges, because to do otherwise would have required them to acknowledge that their earlier decision had been "hasty" and to "admit they were wrong to Dr. Ritten." (Plaintiff's Response, Ex. Q, Brengel Dep. at 31-32.) Indeed, one of the lay committee members, David Sommerville, conceded that he "[p]retty much" discounted Plaintiff's presentation to the committee, and that he also discounted the testimony of "[a] couple of" the experts called as witnesses by Plaintiff, explaining that "there was a question in my mind whether they were experts or not." (Sommerville Dep. at 202-03.)

Yet, such claims about the weight that could or should have been given to the competing evidence in the record do not overcome the presumption that the hearing

48

committee acted in the reasonable belief that the continued suspension of Plaintiff's privileges would further quality health care and was warranted by the facts presented to the committee. Again, the question under the HCQIA immunity standard is not whether "the conclusions reached by [the committee] were in fact correct," *Poliner,* 537 F.3d at 378 (footnote with citation omitted), or whether this Court, a factfinder, or an independent medical professional might reach a different conclusion upon fresh review of the evidence, *see Meyers,* 341 F.3d at 468-69 & n.5; *Sugarbaker,* 190 F.3d at 914, 916; *Reyes,* 102 F. Supp.2d at 813-15. Rather, the "reasonable belief" standard is satisfied so long as an objective view of the record discloses a sufficient basis for the committee's decision. Notwithstanding Plaintiff's critique of portions of this record and his questions about the motives and competence of the lay committee members, the Court finds no basis upon which a reasonable juror could conclude that the committee, in voting to continue the suspension of Plaintiff's privileges, lacked a "reasonable belief" that this action was taken in furtherance of quality health care and was warranted by the facts presented in the hearing process.

In the end, the Court must be mindful that the immunity provisions of the HCQIA are quite clearly designed to avoid excessive scrutiny of professional review actions in civil litigation. As observed at oral argument, these provisions have the salutary effect of ensuring that the Court need not weigh the conflicting views of medical professionals or second-guess a hospital review committee's decision whether to grant or suspend clinical privileges — tasks this Court lacks the expertise to perform. Instead, the Court is called

49

upon only to determine whether a particular decision, viewed objectively, meets the four criteria set forth at § 11112(a) — and to begin this inquiry with the presumption that it does. While it is perhaps possible to conceive of a hearing process as lengthy and thorough as the one in this case that nonetheless fails to produce a decision that meets these fairly forgiving standards for immunity, the record before this Court does not permit the conclusion that the decision at issue here suffers from any such deficiencies. Accordingly, Defendants are immune from liability for damages arising from their participation in the process leading to the hearing committee's decision to continue the suspension of Plaintiff's staff privileges.

### 3. The Impact of the Court's HCQIA Immunity Inquiry upon Plaintiff's Claims

In light of the Court's rulings as to the availability of HCQIA immunity, one of Plaintiff's state-law claims is no longer viable. Specifically, in count IV of the complaint, Plaintiff asserts a claim of defamation against Defendants Allen, Daly, and Gromada grounded upon their January 20, 2006 letter in which they identified various patient care concerns that had arisen since Plaintiff's privileges had been suspended. (*See* Plaintiff's Response, Ex. D-35.) When asked to identify the harm that resulted from this allegedly defamatory communication, Plaintiff testified that the information in this letter was disseminated to the Board of Trustees, including the Board members who were on the hearing committee, and that this information, in turn, tainted the hearing process through which the suspension of his privileges was continued and made permanent. (*See*

Plaintiff's Dep. at 363-64; *see also* Second Amended Complaint at ¶ 89 (identifying the damages caused by this allegedly defamatory communication as including the "[e]conomic losses . . . resulting from the loss of [Plaintiff's] staff privileges").) Consequently, this claim arises from the participation of Defendants Allen, Daly, and Gromada in the hearing process, and the HCQIA immunity conferred upon the outcome of this process serves to shield these participants from liability for damages for their roles in this process. *See* 42 U.S.C. § 11111(a)(1)(D).

The Court's rulings on HCQIA immunity also have a more limited effect upon Plaintiff's other claims. First, to the extent that Plaintiff's claims of tortious interference in counts II and III of the complaint rest upon conduct occurring in the course of the hearing process — an issue discussed in greater detail below — the immunity conferred upon the outcome of this process also bars the imposition of liability for the actions of the participants in this process. Next, while the HCQIA poses no barrier to Plaintiff's ability to pursue the equitable relief of reinstatement of his staff privileges as part of his requested recovery under his count I claim of EMTALA retaliation, the damages portion of this recovery necessarily is limited to the harm Plaintiff suffered as a result of the summary suspension of his staff privileges, first by Buxton and then by the Board, and does not extend to any additional losses sustained after the hearing committee decided to continue this suspension. After this point, the immunity conferred under the HCQIA cuts off all further liability for damages.

**D.      Defendants Are Entitled to Summary Judgment in Their Favor as to**

**Plaintiff's Claims of Tortious Interference, With the Exception of the Claim Asserted Against Defendant Buxton in Count II of the Complaint.**

Having addressed Plaintiff's federal claim under the EMTALA and Defendants' appeal to immunity under the HCQIA, the Court now turns to Defendants' remaining challenges to the state-law claims asserted in Plaintiff's complaint.  In counts II and III of the complaint, Plaintiff alleges (i) that Defendants LRMC, Buxton, Mango, Daly, Allen, and Gromada tortiously interfered with his business relationships with his patients by bringing about the suspension of his staff privileges at LRMC, and (ii) that Defendants Buxton, Mango, Daly, Allen, and Gromada tortiously interfered with his business relationship with LRMC, once again by bringing about the suspension of his privileges to practice at this hospital.  In support of their request for summary judgment on these claims, Defendants argue primarily that Plaintiff has failed to produce evidence that they acted with malice, as necessary to sustain claims of tortious interference under the circumstances presented here.  The Court agrees as to some Defendants but disagrees as to others.

As both sides agree, to prevail on a claim of tortious interference under Michigan law, a plaintiff must show, among other things, "the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law." *Feldman v. Green,* 138 Mich. App. 360, 360 N.W.2d 881, 886 (1984).  "To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the

improper motive of the interference." *Mino v. Clio School District,* 255 Mich. App. 60, 661 N.W.2d 586, 597 (2003) (internal quotation marks and citations omitted). Similarly, to the extent that Defendants assert that some of the statements giving rise to Plaintiff's claims of tortious interference are protected by a common-law qualified privilege, this qualified privilege may be overcome through a "showing that the statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Prysak v. R.L. Polk Co.,* 193 Mich. App. 1, 483 N.W.2d 629, 636 (1992). Finally, Michigan recognizes a statutory qualified privilege for providing information to a hospital peer review committee, but this qualified privilege, again, "does not apply to a person, organization, or entity that acts with malice." Mich. Comp. Laws § 331.531(4). Thus, the parties agree that the viability of Plaintiff's two claims of tortious interference hinges upon the existence of evidence that Defendants acted with malice.

Turning first to Defendant Gromada, Plaintiff has failed to produce evidence from which a trier of fact could conclude that he acted with the requisite improper motive or malice. The evidence produced by Plaintiff consists of (i) Dr. Gromada's economic incentive to assist in the effort to suspend Plaintiff's staff privileges, as this would increase his patient load at Plaintiff's expense, (ii) Dr. Gromada's agreement to sign the January 20, 2006 letter expressing concerns about the care of Plaintiff's patients and related issues, and (iii) Plaintiff's testimony that, according to one of his patients, Dr. Gromada had told this patient a fabricated story about why Plaintiff's privileges had been suspended. Yet, this last piece of evidence is inadmissible hearsay that may not be

considered in deciding a summary judgment motion, *see U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir. 1997), and the Court has already explained that the three physicians who signed the January 20, 2006 letter are protected by HCQIA immunity for this act of participation in the hearing process to determine whether the suspension of Plaintiff's privileges should be continued.  This leaves only the suggestion that Dr. Gromada acted out of improper pecuniary motives, but this is utterly speculative.

As to Defendant Allen, apart from her purported economic incentive to assume some of Plaintiff's patient load and her decision to sign the January 20, 2006 letter,[31] Plaintiff points to his own testimony regarding (i) an unspecified occasion when Dr. Allen made a false statement about Plaintiff's practices with respect to neonatal transfers, (ii) another unspecified occasion where she took over one of Plaintiff's patients, and (iii) Dr. Allen's involvement in the Patient "L" incident, during which she gave a report of the patient's condition that contradicted the results of Plaintiff's own examination.  As to the first two incidents, however, Plaintiff's testimony is hopelessly vague, lacking even such rudimentary details as what happened and when, and thus cannot possibly support a reasonable inference of malice or improper motive.  With regard to the Patient "L" incident, while Plaintiff opined that Dr. Allen's disagreement with his own assessment was tantamount to a "lie[]," he candidly acknowledged that he could only "guess" as to

---

[31]In addition to signing this letter, Dr. Allen and Dr. Daly appeared at a January 17, 2006 Board of Trustees meeting where they expressed concerns similar to those outlined in the letter. Just as the letter qualifies as participation in the hearing process which is shielded by HCQIA immunity, the appearance of these two Defendants at the Board meeting also is shielded by immunity, and may not give rise to state-law tort liability.

what might have motivated her to report these findings.  (Plaintiff's Dep. at 132, 140.)
Once again, then, Plaintiff has failed to produce evidence from which a trier of fact could
conclude that Dr. Allen acted with the requisite improper motive or malice.

Next, while Plaintiff has produced a greater volume of evidence as to actions taken
by Defendant Daly which, in his view, establish her malice or otherwise improper motive,
the Court again concludes that any finding by a trier of fact on this point would be
impermissibly speculative.  Beyond raising questions about Dr. Daly's pecuniary motives
and citing her role in the January 20, 2006 letter and January 17, 2006 Board of Trustees
meeting, Plaintiff points to the testimony of himself and others indicating that Dr. Daly
made disparaging remarks at various points about his competence and the quality of his
patient care, that she engaged in repeated efforts to disrupt Plaintiff's practice and
generate additional administrative scrutiny of his cases, and that she told others that she
was afraid of Plaintiff and felt physically threatened by him.  At least some of these
disparaging remarks and allegations of Plaintiff's threatening behavior were made at the
September 9, 2005 special meeting at which the Board of Trustees voted to reinstate the
summary suspension of Plaintiff's privileges.

Yet, while this evidence surely indicates that Dr. Daly had substantial misgivings
about the quality of patient care provided by Plaintiff, and that her expressions of these
misgivings might well have led to some degree of personal conflict between her and
Plaintiff, this does not rise to the level of malice or improper motive as necessary to
sustain a tortious interference claim under Michigan law.  The Michigan courts have

55

explained that "improper," in this context, "means illegal, unethical, or fraudulent."

*Michigan Podiatric Medical Association v. National Foot Care Program,* 175 Mich. App.

723, 438 N.W.2d 349, 355 (1989) (internal quotation marks and citations omitted).

Although Plaintiff clearly does not share Dr. Daly's assessment of his practice or

professional skills, her expressions of her views on these subjects cannot be described as

"illegal, unethical, or fraudulent" activity.  Neither is there any basis, beyond Plaintiff's

speculation, to conclude that Dr. Daly's criticisms of Plaintiff on matters of patient care

were motivated by malice or a reckless disregard for the truth, as opposed to a legitimate

concern for patient care.  *See Mino,* 661 N.W.2d at 597 (noting that a finding of malice

cannot rest upon actions "motivated by legitimate business concerns" (internal quotation

marks and citation omitted)).  Accordingly, the record is insufficient to establish a

tortious interference claim against Dr. Daly.

Turning next to Defendant Mango, the sole purported evidence of malice or

improper motive cited in Plaintiff's response brief is Mango's allegedly false statements

regarding the Patient "L" incident.  (*See* Plaintiff's Response Br. at 39.)  Yet, the

allegedly false statements identified by Plaintiff were made in the course of Mango's

testimony during the hearing on the reinstatement or continued suspension of Plaintiff's

staff privileges.  Since the product of this hearing process is protected by HCQIA

immunity, Mango's participation in this process is likewise shielded by immunity.

Although Plaintiff also complains about Mango's statements during the September 9,

2005 special meeting at which the Board of Trustees voted to reinstate the summary

suspension of Plaintiff's privileges, charging that Mango "repeated alleged hearsay of alleged concerns" relayed to him by other nurses regarding Plaintiff's patient care practices, (Plaintiff's Response Br. at 4), Plaintiff fails to cite any evidence from which a trier of fact could conclude that Mango acted with malice or improper motives in advising the Board of concerns conveyed to him by nurses under his supervision.  Thus, the tortious interference claims against Defendant Mango cannot go forward.

As to Defendant Buxton, however, the Court finds that Plaintiff has produced sufficient evidence from which a trier of fact could find malice or improper motive.  As discussed earlier, although Buxton has cited other grounds — specifically, Plaintiff's "frequent deviation from patient safety indicators in [his] treatment of obstetrical patients and in [his] delivery of babies," including "numerous, unnecessary instrument-assisted deliveries," (Plaintiff's Response, Ex. D-13) — for his decision to summarily suspend Plaintiff's privileges, the Court has found that issues of fact remain as to whether Buxton instead was motivated by Plaintiff's actions in the then-recent Patient "L" incident.  This, in turn, could be found by a trier of fact to constitute an "improper" motive, if the trier of fact were to conclude that Buxton acted in retaliation against Plaintiff's refusal to transfer a patient with an emergency medical condition that had not been stabilized.  In addition, the Court has noted the questions in the record as to whether Buxton acted precipitously in summarily suspending Plaintiff's privileges, citing the findings of Dr. Petroff before his review had been completed.  This, too, could permit an inference of an improper motive for Buxton's actions, where there is reason to question his stated justification for

57

these actions.

Nonetheless, apart from their evidentiary challenge to Plaintiff's claims of tortious interference, Defendants argue that the claim asserted in count III — tortious interference with Plaintiff's business relationship with LRMC —  may not go forward as to Defendants Buxton and Mango because these individuals are hospital employees.  As Defendants observe, "[t]o maintain a cause of action for tortious interference, the plaintiff[] must establish that the defendant was a 'third party' to the contract or business relationship."  *Reed v. Michigan Metro Girl Scout Council,* 201 Mich. App. 10, 506 N.W.2d 231, 233 (1993).  It follows that "corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation."  *Reed,* 506 N.W.2d at 233.

While Plaintiff points to the purportedly malicious acts and recklessly false statements of Buxton and Mungo as evidence that they were acting out of personal motives, the acts and statements identified by Plaintiff all concern issues of patient care.  Even if Buxton or Mungo harbored ill will against Plaintiff because of disagreements on such issues, this does not take their actions and statements outside the context of their employment at LRMC and transform them into actions taken "strictly for [their] own personal benefit."  *Reed*, 506 N.W.2d at 233.  Indeed, it is not clear what personal benefit Buxton or Mungo might have derived from Plaintiff's loss of his staff privileges.  Accordingly, Defendants Buxton and Mungo are entitled to summary judgment in their

favor on the claim of tortious interference set forth in count III of the complaint.[32]

**E.      Issues of Fact Remain as to Plaintiff's Count V Claim of Defamation.**

In count V of his complaint, Plaintiff asserts a state-law claim of defamation

against LRMC and Buxton arising from the report of the suspension of Plaintiff's

privileges to the National Practitioner Data Bank.[33]  As discussed below, the viability of

this claim, like Plaintiff's claims of tortious interference, turns largely upon the question

whether Defendants acted with malice in making the communication at issue.

Among the elements of a defamation claim under Michigan law, the only one that

is presently at issue is that there must have been "an unprivileged communication to a

third party."  *DeFlaviis v. Lord & Taylor, Inc.,* 223 Mich. App. 432, 566 N.W.2d 661,

667 (1997).  As with Plaintiff's claims of tortious interference, Defendants appeal to a

qualified privilege — in this instance, one that "appl[ies] to communications on matters

of 'shared interest' between parties."  *Rosenboom v. Vanek,* 182 Mich. App. 113, 451

N.W.2d 520, 522 (1989).  Again, however, this qualified privilege may be overcome "by

showing that the statement was made with actual malice, that is, knowledge of its falsity

or reckless disregard of the truth."  *Gonyea v. Motor Parts Federal Credit Union,* 192

Mich. App. 74, 480 N.W.2d 297, 300 (1991).  Similarly, while the HCQIA protects

---

[32]This, of course, is in addition to the Court's determination that count III fails as to Defendants Mango, Daly, Allen, and Gromada for lack of evidence of malice or improper motive.

[33]Plaintiff also has asserted a claim of defamation in count IV of his complaint but, as discussed earlier, this claim is defeated by HCQIA immunity.

against civil liability for persons or entities filing reports with the National Practitioner

Data Bank, *see* 42 U.S.C. § 11137(c), this immunity is unavailable if "there is sufficient

evidence for a jury to conclude that the report was false and the reporting party knew it

was false." *Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324, 1334 (10th Cir.

1996).

In one respect, it plainly cannot be said that the report in question was false.

Specifically, the latter half of this report recounts the hearing process through which it

was determined that the suspension of Plaintiff's staff privileges should be continued.

(*See* Plaintiff's Response, Ex. D-44.)  This factual account of the hearing process appears

to be entirely accurate, and thus cannot support a claim of defamation.

Matters are different, however, as to the first half of this report.  According to this

portion of the report, the initial summary suspension of Plaintiff's privileges was based

upon an outside review that identified "threat[s] to patient safety" arising from Plaintiff's

use of vacuum deliveries and his "clinical judgment and/or the failure to make patient

care the primary basis for treatment decisions."  (*Id.*)  Yet, as discussed earlier, questions

of fact remain as to whether this was the true reason for the summary suspension imposed

by Buxton and reinstituted by the Board of Trustees, or whether these actions instead

were taken in retaliation against Plaintiff's conduct in the Patient "L" incident.  If the trier

of fact were to reach the latter conclusion, this would permit the further conclusion that

the report to the National Practitioner Data Bank was false, and that Buxton knew it was

false.  Thus, Plaintiff's claim of defamation may go forward as to this aspect of the report.

60

Finally, apart from this question of malice, Defendants suggest that Plaintiff's claim of defamation arising from the National Practitioner Data Bank report is subject to dismissal for failure to exhaust administrative remedies, where a federal regulation, 45 C.F.R. § 60.14, permits a physician to dispute the accuracy of such a report. This regulation, however, provides that a physician *"may"* pursue such a challenge through administrative channels, 45 C.F.R. § 60.14(a) (emphasis added), and thus does not dictate such a course of action as a prerequisite to suit. The cases cited by Defendants are not to the contrary, but instead have required exhaustion as a prerequisite to a request for *injunctive* relief, through which a court would either order the revision of information supplied to the Data Bank, *see Gonino v. Private Health Care Systems, Inc.,* No. 3:04-CV-1940G, 2004 WL 2583625, at *1-*3 (N.D. Tex. Nov. 12, 2004), or enjoin a party from filing such a report, *see Brown v. Medical College of Ohio,* 79 F. Supp.2d 840, 843-45 (N.D. Ohio 1999). In this case, Plaintiff does not seek the correction of a report, as achievable through the administrative process provided under the above-cited federal regulation, but instead complains of harm he has suffered as a result of an already-filed report. Under these circumstances, the Court does not believe that administrative exhaustion is required before Plaintiff may proceed with the defamation claim asserted in count V of his complaint.

**F.     Plaintiff's Breach of Contract Claim**

In the seventh and final count of his complaint, Plaintiff asserts a state-law breach of contract claim arising from the LRMC's alleged breach of its Medical Staff Bylaws in

the course of the summary suspension of Plaintiff's staff privileges, first by Buxton and then by the Board of Trustees.[34]  In seeking summary judgment in its favor on this claim, the LRMC argues that no enforceable contract arises from its Bylaws, and that, in any event, Plaintiff has not produced evidence of a breach of the Bylaws.  The Court disagrees on both scores.

As the parties recognize, there is no Michigan case law on the question whether medical staff bylaws give rise to a contractual relationship that may support a breach-of-contract claim.[35]  Although there is a "split of authority" on this question among the courts of other states, the "majority view . . . appears to be that a hospital's medical staff bylaws constitute a contract between the hospital and the medical staff."  *Islami v. Covenant Medical Center, Inc.,* 822 F. Supp. 1361, 1370-71 (N.D. Iowa 1992) (collecting cases).  This majority position, moreover, is consistent with the analogous Michigan case law holding that a corporation's bylaws constitute a binding contract between the

---

[34]The Court notes that HCQIA immunity is unavailing to Defendants as to this breach-of-contract claim, as it rests solely upon alleged breaches that occurred in the summary suspension of Plaintiff's privileges, and not on any breaches that might have occurred in the subsequent hearing process.  The Court has held that only the hearing committee's decision, and not the earlier decisions to summarily suspend Plaintiff's privileges, is protected by HCQIA immunity.

[35]This dearth of case law is largely attributable to a "judicial nonintervention" doctrine, under which the Michigan courts had held over the years that "[a] private hospital is empowered to appoint and remove its members at will without judicial intervention."  *Long v. Chelsea Community Hospital,* 219 Mich. App. 578, 557 N.W.2d 157, 161 (1996).  This doctrine was recently abrogated by the Michigan Supreme Court in *Feyz v. Mercy Memorial Hospital,* 475 Mich. 663, 719 N.W.2d 1, 10-11 (2006), with the Court reasoning that the doctrine is "inconsistent with the statutory regime governing the peer review process enacted by the Legislature."  Since *Feyz* was decided, the Michigan courts have yet to consider whether medical staff bylaws may give rise to an enforceable contract.

corporation and its shareholders. *See Cole v. Southern Michigan Fruit Association,* 260 Mich. 617, 245 N.W. 534, 536 (1932); *Allied Supermarkets, Inc. v. Grocer's Dairy Co.,* 45 Mich. App. 310, 206 N.W.2d 490, 493 (1973), *aff'd,* 391 Mich. 729, 219 N.W.2d 55 (1974).  Finally, to the extent that Defendants contend that the Medical Staff Bylaws fail to qualify as an enforceable contract because only practitioners, and not the LRMC, are bound by them, Plaintiff points to the deposition testimony of the Chair of the Board of Trustees, Kathryn Lawter, that the Bylaws are binding on the Board and the medical staff alike, (*see* Plaintiff's Response, Ex. N, Lawter Dep. at 52-53), and the Bylaws include numerous provisions — including the ones relied on by Plaintiff here — that purport to impose obligations on the Board.  Consequently, the Court finds no legal obstacle in this case to Plaintiff's assertion of a breach-of-contract claim.

The Court further concludes that issues of fact remain as to whether Defendant LRMC breached its Medical Staff Bylaws in the summary suspensions of Plaintiff's staff privileges by Buxton and the Board of Trustees.  As to the first of these suspensions, the Bylaws dictate that Buxton's action must have been triggered by the "conduct of a Practitioner" that "requires that immediate action be taken to protect the life of any patient or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient, employee, or other person present in the Hospital."  (Defendants' Motion, Ex. 1, Medical Staff Bylaws § 8.02.01.)  As explained earlier, there are questions of fact under the present record as to whether Buxton actually acted on such a basis, or instead took action in retaliation against Plaintiff's refusal to transfer Patient "L."

Moreover, Defendants have not established as a matter of law that a summary suspension was necessary to protect the life of any particular patient or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient who was actually "present in the Hospital" at the time.

Neither can it be said as a matter of law that the decision by the Board of Trustees to reinstate the summary suspension of Plaintiff's staff privileges fully comported with the Medical Staff Bylaws.  As Plaintiff points out, once the Medical Executive Committee voted to rescind the summary suspension imposed by Buxton, the Bylaws seemingly dictated that the Board of Trustees could not act contrary to the MEC's "[f]avorable recommendation" until Plaintiff was first "notified that he . . . [wa]s entitled to, and ha[d] been afforded, a hearing."  (Medical Staff Bylaws § 9.01.02.)[36]  Yet, no such hearing was held before the Board voted to reinstate the summary suspension of Plaintiff's privileges.  It follows that Defendants are not entitled to summary judgment in their favor on Plaintiff's breach-of-contract claim.

## G.    The Liability of the LRMC's Parent Corporation, Defendant McLaren

---

[36]Defendants suggest that the MEC's decision is properly characterized as "adverse" rather than "favorable" under the Bylaws, as it recommended the reinstatement of Plaintiff's privileges subject to the appointment of a preceptor and the retention of an outside consultant to review certain of Plaintiff's past cases.  (*See* Medical Staff Bylaws § 1.01 (defining a recommendation or decision as "adverse" if it "favors . . . a consultation requirement").)  Yet, the Bylaws define a "favorable" recommendation or decision as one which "favors . . . dissolution of a summary suspension," (*id.* § 1.08), and the MEC in this case plainly voted to rescind the summary suspension imposed by Buxton.  Thus, it would appear that the action of the Board of Trustees was governed by the Bylaw provision cited by Plaintiff — namely, the provision that applies if the Board adopts an "adverse decision" that is "contrary to a Favorable recommendation of the Medical Executive Committee."  (*Id.* § 9.01.02.)

As the final issue presented in their summary judgment motion, Defendants contend that Plaintiff's efforts in counts I, II, and V of the complaint to impose vicarious liability upon the LRMC's parent corporation, Defendant McLaren Health Care Corporation, fail for lack of any evidence that "McLaren exerts control over actions of the Medical Center."  (Defendants' Motion, Br. in Support at 50.)  This is the sum total of the argument offered by Defendants on this point, and no effort has been made to address or refute, for example, the evidence that Defendant Buxton reports directly to McLaren's chief executive officer, Phillip Incarnati, who provides direction to Buxton and conducts his annual performance reviews.  (*See* Plaintiff's Response, Ex. D, Buxton Dep. at 24-27.)  Under this record, the Court cannot say that the evidence is insufficient as a matter of law to establish the "control" test that, as both sides agree, governs Plaintiff's effort to impose liability upon Defendant McLaren.  *See Ashker v. Ford Motor Co.,* 245 Mich. App. 9, 627 N.W.2d 1, 4-5 (2001).

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' February 27, 2008 motion for summary judgment (docket #107) is GRANTED IN PART and DENIED IN PART, in accordance with the rulings in this opinion and order.  IT IS FURTHER ORDERED that Plaintiff's May 13, 2008 motion for leave to file surreply (docket #125) is GRANTED.  Finally, IT IS FURTHER ORDERED that Defendants' February 19, 2009 motion for leave to file post-hearing brief (docket #142) is DENIED.

65

s/Gerald E. Rosen
Chief  Judge, United States District Court

Dated:  March 11, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 11, 2009, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager