**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GARY M. RITTEN, M.D.,

       Plaintiff,                         Case No. 07-10265

v.                                    Hon. Gerald E. Rosen

LAPEER REGIONAL MEDICAL CENTER, *et al.,*

       Defendants.
_____/

**OPINION AND ORDER REGARDING**
**VARIOUS PENDING PRETRIAL MOTIONS**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     January 25, 2010

PRESENT:  Honorable Gerald E. Rosen
                   Chief Judge, United States District Court

Three motions *in limine* presently are pending before the Court in this case, along with Plaintiff's motion for leave to call more than two expert witnesses at trial. This opinion and order sets forth the Court's rulings on these motions.

**I.**    **Defendants' Motion *in Limine* to Exclude Evidence Relating to Reinstatement and Damages**

In the first of their two motions *in limine,* Defendants seek an order precluding Plaintiff from introducing at trial evidence relating to (i) Plaintiff's request for reinstatement of his staff privileges, (ii) any loss of income suffered by Plaintiff after July 18, 2006, the date that a hearing committee voted to continue the suspension of Plaintiff's staff privileges, and (iii) certain items identified by Plaintiff as part of the damage award

he seeks at trial.  The Court addresses each of these three categories of evidence in turn.

### A.    Plaintiff's Request for Reinstatement or Front Pay

First, as to Plaintiff's request for reinstatement of his staff privileges — or, alternatively, an award of front pay in lieu of reinstatement — Defendants argue that this remedy is no longer appropriate, in light of the Court's ruling in its March 11, 2009 opinion and order that Defendants are entitled to immunity under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq.,* for their participation in the process that led to a hearing committee's July 18, 2006 decision to continue the suspension of Plaintiff's staff privileges.  Plaintiff, in contrast, contends that the equitable remedy of reinstatement remains available, where the HCQIA confers only immunity from "liab[ility] in damages."  42 U.S.C. § 11111(a)(1).

Defendants' challenge to the equitable remedy of reinstatement proceeds by analogy to the Supreme Court's decision in *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S. Ct. 879 (1995).  In that case, arising under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* the Court held that "as a general rule . . . , neither reinstatement nor front pay is an appropriate remedy" in cases where a defendant employer produces "after-acquired evidence of wrongdoing . . . of such severity that the [plaintiff] employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the [plaintiff's] discharge."  *McKennon,* 513 U.S. at 361-63, 115 S. Ct. at 886-87.  Similarly, in the present case, Defendants argue that neither reinstatement nor front pay would be

2

appropriate, where the initial suspension of Plaintiff's staff privileges ultimately was confirmed by a hearing committee following a lengthy hearing process, and where the Court held in its March 11 opinion that the hearing committee's decision satisfied the standards for HCQIA immunity. This hearing committee decision, in Defendants' view, is analogous to an employer's after-acquired information that would independently warrant an employee's discharge, as it provides a legitimate ground for the suspension of Plaintiff's privileges that is altogether separate from and untainted by any legal infirmity in the initial decision to suspend these privileges. Although the analogy to *McKennon* is not perfect, the Court agrees that the Supreme Court's reasoning, when applied to the present context, forecloses an award of reinstatement or front pay in this case.

Plaintiff's plea for reinstatement or front pay rests upon his claim that Defendants violated the Emergency Medical Treatment and Active Labor Act ("EMTALA") by suspending his privileges in retaliation for his "refus[al] to authorize the transfer of an individual with an emergency medical condition that ha[d] not been stabilized." 42 U.S.C. § 1395dd(i). Under this statute, Plaintiff may seek an award of damages "and such equitable relief as is appropriate," 42 U.S.C. § 1395dd(d)(2)(A), and he argues — like Defendants, by analogy to the case law addressing claims of employment discrimination and retaliation — that reinstatement of his staff privileges or front pay would be appropriate equitable relief under the circumstances presented here. In its March 3 ruling, the Court found that issues of fact remained as to whether Defendants violated the EMTALA's anti-retaliation provision in the initial September 2, 2005

summary suspension of Plaintiff's privileges and in the immediately ensuing September 9, 2005 decision by the Defendant hospital's Board of Trustees to continue this suspension. It follows that Plaintiff is entitled to introduce evidence at trial in support of his effort to recover for these alleged EMTALA violations.

As to the hearing committee's subsequent determination in July of 2006 that Plaintiff's privileges should remain suspended, however, the Court did not decide whether this determination was made "because" of Plaintiff's refusal to transfer a patient, as necessary to sustain an EMTALA claim of retaliation arising from this decision. *See* 42 U.S.C. § 1395dd(i).[1] Rather, the Court held that the immunity conferred under the HCQIA precluded any further recovery of damages — whether under the EMTALA or any other theory of recovery advanced in Plaintiff's complaint — for any "losses sustained after the hearing committee decided to continue" the suspension of Plaintiff's privileges. (3/11/2009 Op. at 51.) In so ruling, the Court necessarily determined as a matter of law that the hearing committee's decision met the criteria for HCQIA immunity — that is, that the committee acted in "the reasonable belief that the action was in furtherance of quality health care," as well as "the reasonable belief that the action was warranted by the facts known after [a] reasonable effort to obtain facts and after" adequate notice and hearing procedures. 42 U.S.C. § 11112(a)(1), (4).

---

[1]The Court noted that Plaintiff's staff privileges had been suspended for nearly a year by the time of the hearing committee's decision. Because this alone would qualify as an "adverse action" under the EMTALA's anti-retaliation provision, the Court deemed it unnecessary to consider whether the hearing committee's decision constituted still another "adverse action." (*See* 3/11/2009 Op. at 29.)

4

As Plaintiff correctly observes, this ruling falls short, in two respects, of a definitive statement that the equitable relief of reinstatement or front pay is not available in this case.  First, the HCQIA confers immunity only from "liab[ility] in damages," 42 U.S.C. § 11111(a)(1), and does not foreclose an award of equitable relief, as the Court expressly recognized in its March 11 ruling.  (*See* 3/11/2009 Op. at 51.)  Next, because the availability of HCQIA immunity is determined by objective standards, and is not affected by "charges of bias, bad faith, hostility, self-interest, and other subjective motivations," (*id.* at 47), it is logically possible that one or more members of the hearing committee could have acted with retaliatory motives in violation of the EMTALA, and yet the committee's decision could still have satisfied the objective criteria for HCQIA immunity.

Nonetheless, while the Court's March 11 ruling does not altogether foreclose an award of reinstatement or front pay under the EMTALA, the Court concludes that such relief would be inappropriate under the reasoning of *McKennon* as applied to the facts of this case.  In *McKennon,* the case came to the Court "on the express assumption that an unlawful motive was the sole basis for the firing" of the plaintiff employee, with the defendant employer only later learning of the misconduct that would have independently justified the plaintiff's discharge.  *McKennon,* 513 U.S. at 359-60, 115 S. Ct. at 885. Thus, "[t]he employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for" the misconduct that the employer discovered after the employee's discharge.  513 U.S. at 360, 115 S. Ct. at 885.  Despite

5

this assumed violation of federal antidiscrimination law, however, the Court found that

the balance of equities was altered by the discovery of the employee's misconduct:

> . . . [E]ven though the employer has violated the [ADEA], we must
> consider how the after-acquired evidence of the employee's wrongdoing
> bears on the specific remedy to be ordered.  Equity's maxim that a suitor
> who engaged in his own reprehensible conduct in the course of the
> transaction at issue must be denied equitable relief because of unclean
> hands, a rule which in conventional formulation operated *in limine* to bar
> the suitor from invoking the aid of the equity court, has not been applied
> where Congress authorizes broad equitable relief to serve important
> national policies.  We have rejected the unclean hands defense where a
> private suit serves important public purposes.  That does not mean,
> however, the employee's own misconduct is irrelevant to all the remedies
> otherwise available under the statute . . . .  In giving effect to the ADEA, we
> must recognize the duality between the legitimate interests of the employer
> and the important claims of the employee who invokes the national
> employment policy mandated by the Act.  The ADEA, like Title VII, is not
> a general regulation of the workplace but a law which prohibits
> discrimination.  The statute does not constrain employers from exercising
> significant other prerogatives and discretions in the course of the hiring,
> promoting, and discharging of their employees.  In determining appropriate
> remedial action, the employee's wrongdoing becomes relevant not to punish
> the employee, or out of concern for the relative moral worth of the parties,
> but to take due account of the lawful prerogatives of the employer in the
> usual course of its business and the corresponding equities that it has arising
> from the employee's wrongdoing.
>
> The proper boundaries of remedial relief in the general class of cases
> where, after termination, it is discovered that the employee has engaged in
> wrongdoing must be addressed by the judicial system in the ordinary course
> of further decisions, for the factual permutations and the equitable
> considerations they raise will vary from case to case.  We do conclude that
> here, and as a general rule in cases of this type, neither reinstatement nor
> front pay is an appropriate remedy.  It would be both inequitable and
> pointless to order the reinstatement of someone the employer would have
> terminated, and will terminate, in any event and upon lawful grounds.

513 U.S. at 360-62, 115 S. Ct. at 885-86 (internal quotation marks and citations omitted).

6

In this case, too, the Court finds that the balance of equities is altered by the hearing committee's decision to uphold the suspension of Plaintiff's staff privileges — a decision which, as explained in the March 11 ruling, meets the objective criteria for HCQIA immunity.  Up to the point of the committee's decision, it can be assumed for present purposes — and Plaintiff will have an opportunity to persuade a trier of fact — that the suspension of Plaintiff's privileges was based on a retaliatory motive in violation of the EMTALA.  After that point, however, Defendants had grounds for suspending Plaintiff's privileges that the HCQIA deems worthy of immunity, without regard to whether one or more committee members might have harbored motives that would run afoul of the EMTALA's anti-retaliation provision.  Just as in *McKennon,* Defendants here cannot claim that the hearing committee's decision should absolve them of liability for earlier decisions that are found by a trier of fact to have rested upon unlawful retaliatory grounds.  Yet, in the wake of the extensive hearing process and the hearing committee's decision — a decision which, under the Court's March 11 ruling, was eligible for HCQIA immunity because it was made "in the reasonable belief that the action was in the furtherance of quality health care," 42 U.S.C. § 11112(a)(1) — this Court's determination of "appropriate" equitable relief under the EMTALA necessarily must "take due account of the lawful prerogatives of the [Defendant hospital] in the usual course of its business," and "the corresponding equities that it has arising from" the evidence uncovered during the hearing process that supported the continued suspension of Plaintiff's privileges. *McKennon,* 513 U.S. at 361, 115 S. Ct. at 886.

7

Against this backdrop, the Court finds that the equitable relief of reinstatement or front pay would not be appropriate in this case. As in *McKennon,* this ruling is not designed to punish Plaintiff for any shortfalls in the medical care of his patients. Nor does the Court mean to condone or discount the Defendant hospital's alleged wrongdoing in the initial suspension of Plaintiff's staff privileges. Yet, it is surely part of a hospital's "prerogatives and discretions," *McKennon,* 513 U.S. at 361, 115 S. Ct. at 886, to ensure that staff privileges are given only to those physicians who satisfy the hospital's policies and standards of care, and to suspend a physician's privileges when deemed necessary "in the furtherance of quality health care," 42 U.S.C. § 11112(a)(1). Indeed, the HCQIA embodies a federal policy to protect hospitals in the exercise of this discretion, just as the EMTALA reflects a federal policy to protect physicians from a particular form of retaliation. The Court believes that these interests may best be balanced in this case by permitting Plaintiff to recover for any harm he suffered as a result of the initial, allegedly retaliatory suspension of his staff privileges, but by foreclosing any further relief, whether legal or equitable, once the Defendant hospital had grounds for the suspension of his privileges that are recognized under the HCQIA as worthy of immunity.

Beyond arguing that the equitable relief of reinstatement or front pay is both available under the EMTALA (a contention with which the Court has no quarrel) and appropriate under the circumstances of this case (a position that the Court has now rejected), Plaintiff identifies two other purported defects in Defendants' appeal to the doctrine of after-acquired evidence. First, Plaintiff suggests that Defendants' appeal to

8

this doctrine is procedurally improper in various respects, where they failed to plead it as an affirmative defense, and where they now seek, in effect, "summary judgment" in their favor on this issue through the impermissible vehicle of a motion *in limine.*  Yet, Plaintiff has cited no authority for the proposition that a defendant's challenge to one particular aspect of a plaintiff's plea for relief — as opposed to the entirety of the plaintiff's claim of liability or each and every element of an accompanying prayer for relief — must be raised as an affirmative defense.[2]  Moreover, Defendants can hardly be faulted for raising the doctrine of after-acquired evidence only at the present juncture, as opposed to in their earlier summary judgment motion, where the doctrine's applicability here arises solely as a byproduct of a particular combination of rulings in the Court's March 11 opinion that the parties could not have readily foreseen — namely, (i) that Plaintiff could go forward with his EMTALA claim of retaliation, (ii) that it was unnecessary to decide whether this claim extended to the hearing committee's decision to continue the suspension of Plaintiff's privileges, and (iii) that the committee's decision was entitled to HCQIA immunity.  Finally, to the extent that Plaintiff contends that the applicability of the doctrine of after-acquired evidence is not amenable to determination as a matter of law, the Court finds that all of the necessary predicates to this ruling were decided as a matter of law in the March 11 opinion — most notably, that the hearing committee's decision

---

[2]For what it is worth, Defendants asserted in their affirmative defenses that "[a]ll or a portion of Plaintiff's claims are barred by the doctrine of unclean hands," (Defendants' 9/15/2007 Affirm. Defenses at ¶ 29), and the Supreme Court noted in *McKennon* that the doctrine of after-acquired evidence bears some relationship to equitable notions of unclean hands.

met the standards for HCQIA immunity, at which point the Defendant hospital had a legally valid basis for suspending Plaintiff's staff privileges. Thus, no outstanding factual disputes stand in the way of the Court's pre-trial resolution of an issue that plainly would be within its purview at trial — namely, whether the equitable remedy of reinstatement or front pay would be appropriate in this case.

Next, Plaintiff contends that Defendants cannot successfully appeal to the doctrine of "after-acquired" evidence where the information that purportedly justified the suspension of his privileges was known to the Defendant hospital *before* — or, at a minimum, at the time of — the initial, allegedly retaliatory decisions to suspend Plaintiff's privileges. This contention, however, runs counter to Plaintiff's earlier position, advanced in his opposition to Defendants' summary judgment motion, that Defendants rushed into the initial decisions to suspend his privileges without thoroughly and carefully reviewing his patient care record. The Court, of course, agreed with Plaintiff that issues of fact remained as to this question, and thus rejected Defendants' appeal to HCQIA immunity as to these initial decisions. By the time of the hearing committee's decision, in contrast, the Court determined that Plaintiff's record of patient care had been thoroughly reviewed and scrutinized through the extensive testimony of Plaintiff and several other physicians in the course of a lengthy hearing process, and the Court concluded that this record provided a basis for a reasonable belief that the continued suspension of Plaintiff's privileges "was in furtherance of quality health care," 42 U.S.C. § 11112(a)(1), as required to secure HCQIA immunity. The Court is satisfied

that this set of circumstances is sufficiently analogous to the facts under which the

*McKennon* Court determined that the doctrine of after-acquired evidence was applicable.

Accordingly, Plaintiff will not be permitted to introduce any evidence at trial in support

of a request for reinstatement of his staff privileges or front pay in lieu of reinstatement.

### B.   Evidence of Losses Incurred by Plaintiff After the Hearing Committee's July 18, 2006 Decision to Continue the Suspension of His Staff Privileges

The disposition of the next issue raised in Defendants' motion *in limine* flows

readily from the above discussion, as well as the Court's rulings in its March 11 opinion

and order.  In particular, Defendants seek, with one exception, to preclude Plaintiff from

introducing evidence of economic damages he suffered after the hearing committee

reached its July 18, 2006 decision to continue the suspension of Plaintiff's staff

privileges.  The Court agrees that this evidence should be excluded, subject to the single

exception acknowledged by Defendants.

This result, as noted, flows in significant part from the Court's express rulings in

the March 11 opinion.  Specifically, upon determining that the hearing committee's

decision met the standards for HCQIA immunity, the Court explained that "the damages

portion of [Plaintiff's] recovery [under his claim of EMTALA retaliation] necessarily is

limited to the harm Plaintiff suffered as a result of the summary suspension of his staff

privileges, first by [Defendant Barton] Buxton and then by the Board [of Trustees], ***and***

***does not extend to any additional losses sustained after the hearing committee decided***

***to continue this suspension.***"  (3/11/2009 Op. at 51 (emphasis added).)  Although, as

11

explained above, this ruling left open the possibility of equitable relief that might extend beyond the date of the hearing committee's decision, the Court has now determined that such equitable relief would not be appropriate under the circumstances presented here. It seemingly follows that this aspect of Defendants' motion *in limine* must be granted.

In an effort to avoid this result, Plaintiff seizes on the Court's reference to "additional" losses in the above-quoted passage from the March 11 opinion. In Plaintiff's view, he will be able to show at trial, through his damages expert, that the losses he suffered after the July 18, 2006 hearing committee decision flowed ***not*** from this decision, but from the earlier summary suspension of his privileges in September of 2005. Based on this anticipated testimony, Plaintiff asserts that his medical practice and earnings capacity had already been severely and permanently damaged by the time of the hearing committee's decision, such that no "additional" losses flowed from this decision. Thus, Plaintiff contends that the Court's grant of HCQIA immunity as to the July 18, 2006 hearing committee decision should not impair his ability to recover damages for harms he suffered after this decision, because all such losses derived from the earlier, non-immunized summary suspension of his privileges.

This argument, if accepted, would seriously undermine the effectiveness of the immunity conferred by the HCQIA upon a hospital's professional review process. Taken to its logical conclusion, Plaintiff's contention would mean that the Defendant hospital need not have bothered with its lengthy review process — a process spanning several months and consisting of eleven four-hour sessions — because Plaintiff's ability to earn

an income from the practice of medicine had been irrevocably and permanently harmed from the moment of the summary suspension of his privileges in September of 2005, and reinstatement of these privileges by the review committee could not have stemmed these losses.  Under the HCQIA, however, once the review committee made a decision that met the requisite statutory criteria, the participants in this review process were entitled to immunity from liability in damages.  42 U.S.C. § 11111(a)(1).  In order to give effect to this grant of immunity — and to give effect as well to the Court's decision to apply the doctrine of after-acquired evidence — Plaintiff will not be permitted to introduce evidence of any losses or economic damage he suffered after the hearing committee reached its decision on July 18, 2006.[3]

As Defendants recognize, this ruling is subject to one exception.  In Count V of his complaint, Plaintiff has asserted a state-law claim of defamation arising from a report to the National Practitioner Data Bank regarding the basis for the summary suspension of Plaintiff's staff privileges.  This report was made in the fall of 2006, after the hearing

---

[3]Beyond the problematic legal implications of Plaintiff's effort to recover for losses sustained after the hearing committee's decision, Defendants point out that Plaintiff's theory of recovery lacks factual support.  In support of his contention that his losses, both before and after July 18, 2006, were entirely a product of the summary suspension of his privileges in September of 2005, Plaintiff points to an affidavit submitted by his damages expert, Nitin Paranjpe,  Yet, as Defendants observe, nothing in this affidavit supports the proposition that Plaintiff's earnings capacity was permanently and irrevocably damaged by the summary suspension of his privileges, such that even a reinstatement of these privileges by the hearing committee would not have staunched the flow of these damages.  Rather, Plaintiff's expert merely states as *ipse dixit* that the harm resulting from the summary suspension of Plaintiff's privileges was permanent, without any effort to consider, much less account for, any possible impact upon Plaintiff's earnings potential if his staff privileges had been reinstated at the conclusion of the hearing process.

13

committee's July 18, 2006 decision to continue the suspension of Plaintiff's privileges. Thus, the Court's grant of HCQIA immunity as to the hearing committee's decision does not extend to the subsequent actions giving rise to Plaintiff's defamation claim, and Defendants do not contend otherwise.  To this limited extent, then, Plaintiff will be permitted to introduce evidence of damages he suffered after the hearing committee's July 18, 2006 decision, provided that he lays a foundation upon which the trier of fact could conclude that these damages were a product of Defendants' allegedly defamatory report to the National Practitioner Data Bank.

### C.      Plaintiff's Effort to Recover Damages Beyond Loss of Income

The third and final subject addressed in Defendants' motion *in limine* is Plaintiff's effort to recover various items of damages beyond his lost income and impaired earnings capacity in the wake of the summary suspension of his staff privileges. In Defendants' view, these items are properly characterized as "special damages" that Plaintiff failed to disclose during discovery, and that are not recoverable in any event. In response, Plaintiff contends that these items qualify as consequential damages that were sufficiently identified in his pleadings and discovery responses, and that are recoverable under the EMTALA, contract, and tort theories asserted in his complaint. In particular, Plaintiff identifies two such items of damages that remain in dispute: (i) attorney fees and associated legal costs incurred by Plaintiff while participating in the Defendant hospital's internal processes for challenging the suspension of his staff privileges, and (ii) out-of-pocket expenses, including attorney fees and medical expenses, that Plaintiff views as attributable to his loss of income following the suspension of his privileges. The Court addresses each of these items in turn.

First, as to Plaintiff's claim for attorney fees incurred in the course of the internal hospital proceedings in which he challenged the suspension of his privileges, the Court finds that this item of damages is recoverable in part. Plaintiff expressly identified these attorney fees as an element of his damages in his complaint, (*see, e.g.,* Second Amended Complaint at ¶ 68(b)), and then affirmed in his discovery responses that he was seeking this recovery, albeit without specifying a precise amount. Moreover, Plaintiff has

15

identified support in the Michigan case law for an award of attorney fees incurred in prior legal proceedings as a result of the defendant's tortious conduct or breach of contract. *See Dassance v. Nienhuis,* 57 Mich. App. 422, 225 N.W.2d 789, 797 (1975). Yet, in light of the Court determination that Defendants are entitled to HCQIA immunity for their participation in the hearing committee process that resulted in the continued suspension of Plaintiff's privileges, Plaintiff cannot recover any attorney fees he incurred in this portion of the internal hospital proceedings. Rather, he may only pursue a recovery of the attorney fees (if any) he incurred in the earlier portion of the proceedings — *i.e.,* the portion in which his staff privileges were summarily suspended pending further review by the hearing committee.[4]

Next, Plaintiff seeks to recover certain out-of-pocket expenses that he views as the "natural and probable consequence" of the loss of income he suffered upon the suspension of his staff privileges. (Plaintiff's 4/29/2009 Response Br. at 17.) Specifically, Plaintiff points to (i) attorney fees he expended in relation to various debt collection efforts by his creditors, and (ii) medical expenses he and his family incurred when his health insurance lapsed following his loss of income. As Defendants point out, however, these items of damages were not identified with any sort of specificity in Plaintiff's pleadings or discovery materials, beyond his generalized claim in an

---

[4]This ruling is limited solely to the attorney fees sought by Plaintiff as an element of his damages. The Court has not been asked to decide — and, thus, expresses no view — whether Plaintiff might be entitled to an award of attorney fees in the event that he prevails on one or more of his claims, whether under the EMTALA or under any applicable Michigan law.

16

interrogatory response that his damages included "economic losses as a result of the loss of income/earnings."[5]  The Court agrees with Defendants that these items constitute special damages that Plaintiff was obligated to identify in his pleadings.  *See, e.g., Figgins v. Advance America Cash Advance Centers of Michigan, Inc.,* 482 F. Supp.2d 861, 869-70 (E.D. Mich. 2007); *Fleet Business Credit, LLC v. Krapohl Ford Lincoln Mercury Co.,* 274 Mich. App. 584, 735 N.W.2d 644, 648 (2007).  Moreover, because Plaintiff is seeking an award of damages for lost income, any expenses he might have incurred in an effort to replace or compensate for this lost income would constitute an impermissible double recovery.  *See Donohue v. United States,* 459 F. Supp. 465, 473 (E.D. Mich. 1978) (disallowing the plaintiff's claim for out-of-pocket expenses incurred in securing replacement funds for lost earnings, where the plaintiff had already been awarded a "full recovery for lost earnings").  Finally, Plaintiff has failed to cite any case in which a court has awarded the out-of-pocket expenses he seeks to recover here.  Accordingly, the Court agrees with Defendants that these items are not recoverable.[6]

---

[5]In his response to Defendants' motion, Plaintiff faults Defendants for failing to either (i) file a motion to compel a more complete response to their interrogatory, to the extent that they believed Plaintiff's initial response was insufficient, or (ii) question Plaintiff at his deposition about the elements of damages he sought to recover.  Yet, Plaintiff stated in his interrogatory answer that "[a]t this time," he could not "identify a specific dollar amount for each element or component of damage identified."  This response surely triggered a duty to supplement once Plaintiff determined a precise dollar amount for each element of damages, *see* Fed. R. Civ. P. 26(e)(1)(A), yet no such additional information was forthcoming in discovery.  Defendants had no affirmative duty to continue to ask for this information.

[6]In any event, even if these items had been properly disclosed in Plaintiff's pleadings or in discovery, and even if these sorts of damages were legally recoverable, Plaintiff's recovery would necessarily be limited to the expenses incurred prior to the hearing committee's July 18, 2006 decision to continue the suspension of his privileges.  It is not clear what portion of

## II.     Plaintiff's Motion *in Limine* to Exclude Evidence Regarding Prior Lawsuit

Turning next to Plaintiff's motion *in limine,* Plaintiff seeks to exclude any evidence regarding two lawsuits he commenced in 2004-05 against another hospital at which he held staff privileges, Huron Memorial Hospital.  In support of this motion, Plaintiff argues that these prior suits are wholly unrelated to the present litigation, and that the prejudicial effect of introducing evidence of these prior actions would substantially outweigh any possible probative value.  The Court agrees.

Plaintiff's prior suits evidently arose from reprimands he received from Huron Memorial Hospital for incidents that occurred back in 1999.  In a federal suit commenced in August of 2004, Plaintiff alleged that one of these 1999 reprimands stemmed from his refusal to transfer an unstable patient with an emergency medical condition, and thus gave rise to a claim under the EMTALA's anti-retaliation provision.[7]  In a state court suit filed in July of 2005, Plaintiff asserted claims of defamation and tortious interference against Huron Memorial Hospital, alleging that the hospital interfered with his application for staff privileges at Crittendon Hospital by falsely reporting that Plaintiff had been the subject of three disciplinary actions back in 1999.[8]

_____

Plaintiff's claimed expenses would qualify under this standard.

[7]This suit evidently was dismissed as time-barred under the EMTALA's two-year statute of limitations.

[8]The state-law defamation and tortious inference claims asserted in Plaintiff's 2005 state court suit evidently were initially advanced in Plaintiff's 2004 federal court action, but the federal court declined to retain jurisdiction over these state-law claims.  The parties apparently settled the state court suit.

Defendants offer three reasons why evidence relating to these prior suits would be relevant here.  First, Defendants wish to introduce evidence of the prior federal action to establish Plaintiff's awareness of an EMTALA-based theory of recovery during the period in late 2005 and early 2006 when he was pursuing the reinstatement of his staff privileges before the Defendant hospital's hearing committee.  In light of this apparent awareness, Defendants suggest that it is telling and relevant that Plaintiff did not allege during the course of the lengthy hearing process that the suspension of his privileges might violate the EMTALA's anti-retaliation provision.  Rather, this EMTALA claim of retaliation first appeared when Plaintiff commenced the present action by filing his January 17, 2007 complaint.

As Plaintiff points out, however, there is no apparent reason why it would have been necessary or beneficial for him to allege or prove the elements of an EMTALA claim of retaliation during the course of the hearing committee proceedings.  Plaintiff's sole concern at that point was to secure the reinstatement of his staff privileges, and there certainly was no need to establish an EMTALA violation in order to obtain this relief.  Moreover, Defendants concede that Plaintiff specifically testified during the course of the hearing process as to the underlying facts giving rise to his EMTALA claim in this case — namely, that Defendant Buxton threatened him with the loss of his job if he refused to transfer Patient "L."  Defendants simply have not established the relevance of Plaintiff's failure to expand upon this testimony and expressly "raise" an EMTALA claim — whatever that might entail — in the course of the administrative hearing process.

Next, Defendants contend that evidence of Plaintiff's prior lawsuits is relevant and necessary to their effort to prevent him from claiming the very same damages that he sought to attribute to Huron Memorial Hospital in the prior suits. Specifically, Defendants point to an item of damages Plaintiff seeks to recover in this case arising from a 2000 effort to open an office in Oxford, Michigan, and they note that he sought a similar recovery in his prior federal suit. In response, Plaintiff states that he has withdrawn this item from the damage award he is pursuing in this case. Accordingly, this does not provide a basis for Defendants to introduce evidence of the damages claimed by Plaintiff in his prior suits.

Finally, and more generally, Defendants assert that "all of the damages claims in Plaintiff's [prior state court suit] duplicate the damages that he claims in the present case." (Defendants' 4/23/2009 Response Br. at 9.) As evidence of this, Defendants cite the complaints in the present and earlier suits, noting that each of these pleadings alleges harm to Plaintiff's professional reputation, loss of goodwill, and economic injury, as well as injury to Plaintiff's expectancy of business relationships with future patients. Yet, while the ***categories*** of damages sought in the current and prior suits might be the same, Defendants have not suggested any basis for concluding that the actual ***items*** of damages are duplicative, and Plaintiff states without contradiction that they are not.[9] Consequently, Defendants have failed to establish the relevance to the present suit of

---

[9]This, of course, is apart from the item of damages discussed above relating to the office in Oxford, which Plaintiff no longer seeks to recover in this case.

evidence of Plaintiff's prior lawsuits against Huron Memorial Hospital.

### III. Plaintiff's Motion for Leave to Call More Than Two Expert Witnesses at Trial

Before returning to the third and final pending motion *in limine,* the Court first addresses Plaintiff's request for leave to call more than two expert witnesses at trial, in addition to his damages expert. At an April 13, 2009 final pretrial conference in this case, Plaintiff's counsel informed the Court that he wished to call up to seven expert witnesses at trial, in addition to Plaintiff's damages expert, but the Court advised counsel that Plaintiff would be limited to two expert witnesses plus his damages expert. Through the present motion, Plaintiff seeks to revisit this matter, contending that he must call at least four expert witnesses, in addition to his damages expert, in order to address all of the issues that will arise at trial. Upon reviewing Plaintiff's proffers regarding the matters upon which these several experts would testify, however, the Court sees no reason to depart from its existing limitation to two expert witnesses.

Plaintiff's motion rests in large part upon the premise that there are a "myriad of issues" that remain for trial. (Plaintiff's 6/12/2009 Motion, Br. in Support at 1.) Yet, as a result of the Court's rulings in its March 11, 2009 opinion and order and the earlier portion of the present opinion addressing Defendants' motion *in limine,* only a fairly limited set of claims and issues need be addressed at trial. Most importantly, while Plaintiff suggests that expert testimony is needed regarding various patient care and other issues raised in the course of the lengthy hearing committee proceedings, these issues will

21

play no part in the forthcoming trial, in light of the Court's determinations (i) that, under

the HCQIA, Defendants are immune from liability in damages for their involvement in

the hearing process culminating in the continued suspension of Plaintiff's staff privileges,

and (ii) that, regardless of whether any member of the hearing committee might have

acted with retaliatory motives in violation of the EMTALA in deciding to continue the

suspension of Plaintiff's staff privileges, the HCQIA precludes an award of damages and

equitable relief would not be appropriate.  As a result of these rulings, there will be no

need at trial to revisit any of the issues raised in the course of the hearing committee

review process, except to the extent that the same issues arose in connection with the

summary suspension of Plaintiff's staff privileges in September of 2005.

The Court is confident that two expert witnesses will suffice to address these more

limited issues.  Generally speaking, these issues concern (i) the procedural aspects of the

process through which Plaintiff's privileges were summarily suspended, and (ii) questions

of patient care that were raised in connection with the summary suspension of Plaintiff's

privileges and the recredentialing process that preceded it.[10]  Upon reviewing the

---

[10]Although Defendants suggest in their response to Plaintiff's motion that the quality and appropriateness of Plaintiff's patient care is no longer at issue in light of the Court's grant of HCQIA immunity as to hearing committee review process, this overlooks the fact that Defendants evidently intend to argue at trial that they should also be entitled to HCQIA immunity for the summary suspension of Plaintiff's privileges.  As Plaintiff points out, because this appeal to HCQIA immunity will entail a showing that these summary suspension decisions were made in the "reasonable belief" that they were in furtherance of quality health care, and because this showing undoubtedly will rest in part upon evidence that concerns were raised about Plaintiff's patient care, Plaintiff surely is entitled to rebut this evidence by introducing evidence (including expert testimony) that his patient care met appropriate medical standards.

22

backgrounds of Plaintiff's expert witnesses and the subjects about which they propose to testify, the Court believes that Plaintiff will be able to judiciously choose, from among his stable of experts, two expert witnesses who together will be able to address these two general categories of subject matter.[11]   Accordingly, the Court adheres to its prior ruling that the parties will be permitted to call no more than two expert witnesses at trial, in addition to their respective damages experts.

## IV.   Defendants' Motion *in Limine* to Exclude Testimony of Plaintiff's Experts

The Court turns finally to Defendants' second motion *in limine*.  Through this motion, Defendants challenge the qualifications and proposed testimony of each of the eight medical experts that Plaintiff has identified as possible witnesses at trial.  As discussed above, the Court has elected to adhere to its decision to allow the parties to call no more than two expert witnesses at trial, in addition to their damages experts.  Under these circumstances, the Court will defer any ruling on Defendants' various challenges to Plaintiff's experts, until such time as Plaintiff identifies the two experts who he intends to call as witnesses at trial.  At that point, Defendants may then, if they wish, renew their motion and revisit their concerns regarding the qualifications of these two chosen experts and the reliability and relevance of the testimony they propose to offer at trial.

## V.   Conclusion

---

[11]By way of example, Plaintiff has identified five of his proposed expert witnesses as board certified OB/GYN physicians who have reviewed many of the cases that were addressed in connection with the summary suspension of Plaintiff's privileges.  Surely, then, Plaintiff should be able to designate one of these experts to testify on all relevant matters concerning Plaintiff's standard of patient care.

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' April 12, 2009 motion *in limine* to exclude evidence relating to reinstatement and damages (docket #148) is GRANTED IN PART and DENIED IN PART, in accordance with the rulings in this opinion and order.  IT IS FURTHER ORDERED that Plaintiff's April 9, 2009 motion *in limine* to prohibit Defendants from introducing evidence regarding prior lawsuits (docket #147) is GRANTED.  Next, IT IS FURTHER ORDERED that Plaintiff's June 12, 2009 motion for leave to call more than two expert witnesses at trial (docket #160) is DENIED.  IT IS FURTHER ORDERED that Defendants' July 10, 2009 motion for leave to file a surreply (docket #164) is DENIED AS MOOT.  Finally, IT IS

FURTHER ORDERED that Defendants' April 12, 2009 motion to exclude the testimony

of Plaintiff's experts (docket #149) is DENIED, but without prejudice to Defendants'

opportunity to renew this challenge after Plaintiff identifies the two experts who he

intends to call as witnesses at trial.


                              s/Gerald E. Rosen
                              Chief Judge, United States District Court

Dated:  January 25, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record
on January 25, 2010, by electronic and/or ordinary mail.

                              s/Ruth Brissaud
                              Case Manager